IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Budimir Anjilivoski, Joseph Avila, Mehran Bambooyani, Saman Bambooyani, Mohammad Ali Baniassadi, Elhadi Bellalem, Stoyan Dafchev, Ehsan Gharehshiran, Darko Hadjidaov, Viktor Isailovski, Mihail Jordanov, Shawn Kanjana, Ricardo Martinez, Vladimir Veljovic, and Jack Youhanna, )<br><br>Plaintiffs, )<br><br>v. )<br><br>Teamsters Local Union No. 727 Pension Fund, Teamsters Local Union No. 727 Health & Welfare Fund, Teamsters Local Union No. 727 Legal and Educational Assistance Fund, )<br><br>Trustees of the Teamsters Local Union No. 727 Pension Fund, Michal DeGrad, John T. Coli, Jr., Nicholas Micaletti, Stephanie Brinson, John McCarthy, Gregory T. Youmans, Carl S. Tominberg, Robert Sheehy, )<br><br>Trustees of the Teamsters Local Union No. 727 Health & Welfare Fund, Michael DeGard, John T. Coli, Jr., Nicholas Micaletti; Stephanie Brinson, John McCarthy, Gregory T. Youmans, Carl S. Tominberg, Robert Sheehy, )<br><br>Trustees of the Teamsters Local Union No. 727 Legal and Educational Assistance Fund Michael DeGard, John T. Coli, Jr., Nicholas Micaletti, Stephanie Brinson, John McCarthy, Gregory T. Youmans, Carl S. Tominberg and Robert Sheehy, )<br><br>Defendants. ) | Case No.  1:19-cv-07452<br><br>Judge<br>Mag. Judge |

**COMPLAINT**

1

Plaintiffs, by their attorneys, Rathje Woodward, LLC, complain of Defendants Teamsters Local Union No. 727 Pension Fund, Teamsters Local Union No. 727 Health & Welfare Fund, Teamsters Local Union No. 727 Legal and Educational Assistance Fund (hereinafter collectively referred to as the "Trust Funds") Michal DeGrad, John T. Coli, Jr., Nicholas Micaletti, Stephanie Brinson, John McCarthy, Gregory T. Youmans, Carl S. Tominberg, Robert Sheehy (hereinafter collectively as "Trustees"), as follows:

### Nature of the Action

1. Plaintiffs, as participants in the Trust Funds as defined under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §1001 *et seq.*, bring this action against Defendants to redress fiduciary violations in which Defendants participated as ERISA fiduciaries in violation of the Trust Agreement and ERISA.

### Jurisdiction, Standing and Venue

2. This Court has jurisdiction pursuant to ERISA §§ 502(e)(1) and 502(f), 29 U.S.C. § 1132(e)(1) and 132(f).

3. Plaintiffs are empowered to bring this action as participants pursuant to ERISA §§ 502(a)(1)(B), 502(a)(2) and 502(a)(3), 29 U.S.C. §§ 1132(a)(1)(B), 1132(a)(2) and 1132(a)(3).

4. Venue is based on 28 U.S.C. § 1391(b)(2) and ERISA §502(e)(2), 29 U.S.C. §1132(e)(2).

### Parties

5. Plaintiff, Budimir Anjilivoski, is a participant in the Trust Funds, is a member of Teamsters Local Union No. 727, and is an Employee of EZ Parking, LLC ("EZ") in Chicago, Cook County, IL.

6.      Plaintiff, Joseph Avila, is a participant in the Trust Funds, is a member of Teamsters Local Union No. 727 ("Union"), and is an Employee of EZ Parking, LLC ("EZ") in Chicago, Cook County, IL.

7.      Plaintiff, Mehran Bambooyani, is a participant in the Trust Funds, is a member of Teamsters Local Union No. 727 ("Union"), and is an Employee of EZ Parking, LLC ("EZ") in Chicago, Cook County, IL.

8.      Plaintiff, Saman Bambooyani, is a participant in the Trust Funds, is a member of Teamsters Local Union No. 727 ("Union"), and is an Employee of EZ Parking, LLC ("EZ") in Chicago, Cook County, IL.

9.      Plaintiff, Mohammad Ali Baniassadi, is a participant in the Trust Funds, is a member of Teamsters Local Union No. 727 ("Union"), and is an Employee of EZ Parking, LLC ("EZ") in Chicago, Cook County, IL.

10.      Plaintiff, Elhadi Bellalem, is a participant in the Trust Funds, is a member of Teamsters Local Union No. 727 ("Union"), and is an Employee of EZ Parking, LLC ("EZ") in Chicago, Cook County, IL.

11.      Plaintiff, Stoyan Dafchev, is a participant in the Trust Funds, is a member of Teamsters Local Union No. 727 ("Union"), and is an Employee of EZ Parking, LLC ("EZ") in Chicago, Cook County, IL.

12.      Plaintiff, Ehsan Gharehshiran, is a participant in the Trust Funds, is a member of Teamsters Local Union No. 727 ("Union"), and is an Employee of EZ Parking, LLC ("EZ") in Chicago, Cook County, IL.

13.     Plaintiff, Darko Hadjidaov, is a participant in the Trust Funds, is a member of Teamsters Local Union No. 727 ("Union"), and is an Employee of EZ Parking, LLC ("EZ") in Chicago, Cook County, IL.

14.     Plaintiff, Viktor Isailovski, is a participant in the Trust Funds, is a member of Teamsters Local Union No. 727 ("Union"), and is an Employee of EZ Parking, LLC ("EZ") in Chicago, Cook County, IL.

15.     Plaintiff, Mihail Jordanov, is a participant in the Trust Funds, is a member of Teamsters Local Union No. 727 ("Union"), and is an Employee of EZ Parking, LLC ("EZ") in Chicago, Cook County, IL.

16.     Plaintiff, Shawn Kanjana, is a participant in the Trust Funds, is a member of Teamsters Local Union No. 727 ("Union"), and is an Employee of EZ Parking, LLC ("EZ") in Chicago, Cook County, IL.

17.     Plaintiff, Ricardo Martinez, is a participant in the Trust Funds, is a member of Teamsters Local Union No. 727 ("Union"), and is an Employee of EZ Parking, LLC ("EZ") in Chicago, Cook County, IL.

18.     Plaintiff, Vladimir Veljovic, is a participant in the Trust Funds, is a member of Teamsters Local Union No. 727 ("Union"), and is an Employee of EZ Parking, LLC ("EZ") in Chicago, Cook County, IL.

19.     Plaintiff, Jack Youhanna, is a participant in the Trust Funds, is a member of Teamsters Local Union No. 727 ("Union"), and is an Employee of EZ Parking, LLC ("EZ") in Chicago, Cook County, IL.

20.     Defendant, Teamsters Local Union No. 727 Pension Fund, is a multi-employer pension fund that receives contributions pursuant to collective bargaining agreements ("CBAs")

4

negotiated by the Teamsters Local Union No. 727 ("Union") with various individual employers and employer associations.

21.     Defendant, Teamsters Local Union No. 727 Welfare Fund, is a multi-employer welfare fund that receives contributions pursuant to collective bargaining agreements ("CBAs") negotiated by the Teamsters Local Union No. 727 ("Union") with various individual employers and employer associations.

22.     Defendant, Teamsters Local Union No. 727 Legal and Educational Assistance Fund, is a multi-employer fund that receives contributions pursuant to collective bargaining agreements ("CBAs") negotiated by the Teamsters Local Union No. 727 ("Union") with various individual employers and employer associations.

23.     Defendant, Michael DeGard, is a Union Business Agent, is Trustee of the Trust Funds.

24.     Defendant, John T. Coli, Jr., is the Secretary-Treasurer of the Union, Trustee of the Trust Funds, and upon information and belief is the Chairman of the Board of the Board of Trustees for the Trust Funds.

25.     Defendant, Nicholas Micaletti, is a Union Business Agent, and is Trustee of the Trust Funds.

26.     Defendant, Stephanie Brinson, was the General Counsel for the Union and is Trustee of the Trust Funds.

27.     Defendant, John McCarthy, is Trustee of the Trust Funds.

28.     Defendant, Gregory T. Youmans, is Trustee of the Trust Funds.

29.     Defendant, Carl S. Tominberg, is Trustee of the Trust Funds.

30.     Defendant, Robert Sheehy, is Trustee of the Trust Funds.

31. The Trust Funds receive contributions from employers by way of CBAs negotiated by the Union with individual employers and Employer Associations.

32. On March 27, 2019, the Union made a demand for recognition on EZ Parking, LLC claiming that EZ Parking, LLC was bound to the Commercial and Valet CBAs that governed Capital Parking, LLC's obligations to the Union and Trust Funds.

33. EZ Parking, LLC entered into collective bargaining agreements with the Union effective February 1, 2019. (See Group Ex. A)

34. The Trust Agreements, ERISA and other documents which govern the Trust Funds require that all contributions paid in accordance with terms of written agreements (CBAs) shall be subject to acceptance by the Trustees.

35. The collective bargaining agreements provide that EZ Parking, LLC could contribute for employees performing commercial work and be relieved of any obligation to contribute to the Trustees of the Teamsters Local Union No. 727 Legal and Educational Assistance Fund pursuant to the Valet CBA for employees performing valet work.

36. Pursuant to the CBAs identified above, EZ Parking, LLC is obligated to contribute to the Trust Funds for covered work.

37. The Union has refused to acknowledge that EZ Parking, LLC is bound to the Commercial CBA, and has denied EZ Parking, LLC the benefits of the CBA, and has instructed the Trust Funds and their Trustees to refuse contributions from EZ Parking, LLC for work under the Commercial CBA. As such, EZ Parking, LLC has been directed to pay contributions to the Legal Education Assistance Fund contrary to the terms of the CBAs.

38. The Trust Funds and their Trustees have refused to accept and apply benefit contributions for EZ Parking, LLC's commercial employee(s), and have taken submitted

contributions and applied them to the Legal Education Assistance Fund contrary to the terms of the CBAs at the direction of the Union.

39.     The Trustees and the Trust Funds have returned contributions which EZ Parking LLC submitted to the Trust Funds which would have created eligibility for health insurance benefits for Plaintiffs.

40.     As a result of the actions of the Union and Trust Funds regarding the application of benefits, Plaintiffs have gone without health insurance and retirement benefits.

41.     The stated basis provided by the Trust Funds and the Trustees for the refusal to apply contributions is that EZ Parking LLC does not have a written agreement with the Union for commercial work, and that the Trust Funds and the Trustees will not allow commercial employees of EZ Parking LLC that are related to the owner of EZ Parking, LLC to receive benefits at the expense of the Legal and Education Assistance Fund.

42.     The Trust Funds and the Trustees were provided with proof that EZ Parking, LLC is indeed covered by the Commercial CBA which allows for the acceptance of contributions thereunder. However, the Trust Funds and the Trustees are allowing the Union to dictate the administration of the Trust Funds and the continued denial of benefits.

43.     The Union desires to put EZ Parking, LLC out of business, and by having the Trust Funds and the Trustees deny its employees benefits, the Trust Funds and Trustees are acting contrary to the stated purpose of the Trust Agreements which is to provide benefits to participants.

**Count I Breach of Fiduciary Duty (All Defendants)**

44.     Plaintiffs reallege and incorporate the allegations in paragraphs 1-43 as if fully alleged herein.

7

45.     The Trust Funds and Trustees diversion of contributions that were meant to provide eligibility health and pension benefits to Plaintiffs to other funds which create no eligibility for benefits to Plaintiffs, was a breach of fiduciary duty under the exclusive purpose of ERISA § 404(a)(1)(A).

46.     Trust Funds and Trustees knowingly participated in the fiduciary violation by their use and diversion of the contributions for the benefit of Plaintiffs to the Trust Funds, when they knew or should have known that such a diversion was contrary to the Trust Agreements, ERISA and the CBAs.

47.     By creating separate eligibility requirements for EZ Parking, LLC employees to receive health and pension benefits, the Trust Funds and Trustees knowingly have diverted contributions meant to benefit EZ Parking, LLC employees to other employees of employers with the same contractual obligations (CBAs) as EZ Parking, LLC.

48.     These acts by Defendants were done without any recognized authority pursuant to any governing document of the Plan.

49.     As a result of the Trust Funds and Trustees actions, Plaintiffs and their beneficiaries have lost eligibility for benefits based on employer contributions, and Plaintiffs are prohibited from self-paying contributions to achieve any benefits for health insurance coverage or otherwise.

50.     Pursuant to ERISA § 409(a) the Trustees are personally liable to Plaintiffs for the losses sustained as a result of the conduct hereinabove alleged which includes medical bills, adverse health conditions which resulted from being denied medical care, and any other damages incurred.

WHEREFORE, Plaintiffs request that a final judgment be entered herein as follows:

1.  Holding Defendants liable for damages sustained by reason of Defendants' breach of fiduciary duty;

2.  Compelling Defendants to accept contributions as set forth in the CBAs which cover the terms and conditions of Plaintiffs employment;

3.  Compelling Defendants to redress their breaches of fiduciary duty by setting the same eligibility for benefits for all employees of employers covered by the Commercial CBA and Valet CBA; and

4.  Awarding Plaintiffs prejudgment interest, reasonable attorney fees pursuant to ERISA § 502 (g), the costs of this action and such other relief that this Court may deem just and proper.

Respectfully submitted,

Budimir Anjilivoski, *et al.*

/s/Raymond J. Sanguinetti
    Raymond J. Sanguinetti

Raymond J. Sanguinetti
Rathje Woodward LLC
300 East Roosevelt Road, Suite 300
Wheaton, IL 60187
rsanguinetti@rahtjewoodward.com
(630) 668-8500
ARDC 6244798

## LETTER OF UNDERSTANDING

This Letter of Understanding is entered into between EZ Parking LLC (the Employer) and Teamsters Local 727, on this 5ᵀᴴ day of June, 2019 and is hereby attached to the Parties' Collective Bargaining Agreement that is in effect from February 1, 2019 through October 31, 2021.

The Parties agree that:

1.  The terms and conditions contained in the attached Collective Bargaining Agreement, which has been executed by the Parties, are incorporated herein.

2.  EZ Parking LLC shall not be held financially liable for any wages, benefits , or penalties, outlined in the attached Collective Bargaining Agreement that occurred prior to February 1, 2019 at only the following locations: 111 North Wabash, and 1043 North Rush. This shall not apply to any other parking or valet location operated by the Company or any future location operated by the Company.

FOR THE EMPLOYER:

FOR THE UNION:

**Exhibit A**



# AGREEMENT

between

## EZ PARKING, LLC

and

## TEAMSTERS LOCAL 727

## FEBRUARY 1, 2019 – JUNE 30, 2021

**Exhibit A**

## TABLE OF CONTENTS

ARTICLE 1 Recognition ........................................................................................ 1

ARTICLE 2 Union Security .................................................................................. 1

ARTICLE 3 Uniforms .......................................................................................... 2

ARTICLE 4 Seniority ........................................................................................... 2

ARTICLE 5 Grievance Procedure ...................................................................... 4

ARTICLE 6 Discipline and Discharge ............................................................... 5

ARTICLE 7 Strikes and Lockouts ...................................................................... 5

ARTICLE 8 Wages ............................................................................................... 6

ARTICLE 9 Holidays ........................................................................................... 6

ARTICLE 10 Military Service .............................................................................. 7

ARTICLE 11 Jury Duty ........................................................................................ 7

ARTICLE 12 Sick and Personal Leave ............................................................... 8

ARTICLE 13 Funeral Leave ................................................................................. 8

ARTICLE 14 Vacations ........................................................................................ 9

ARTICLE 15 Leave of Absence ......................................................................... 11

ARTICLE 16 Hours of Work ............................................................................. 12

ARTICLE 17 Transfers ....................................................................................... 12

ARTICLE 18 Driver's License ........................................................................... 12

ARTICLE 19 Health and Welfare and Legal and Educational Assistance .......... 13

ARTICLE 20 Labor Management Committee .................................................. 15

ARTICLE 21 Teamsters-National 401(k) Savings Plan .................................. 15

ARTICLE 22 Management Rights ..................................................................... 16

ARTICLE 23 Doctors' Examinations ............................................................... 16

ARTICLE 24 Time Records ............................................................................... 16

ARTICLE 25 Access to Facility ........................................................................ 16

ARTICLE 26 Payday ........................................................................................... 17

ARTICLE 27 Maintenance of Benefits ............................................................ 17

ARTICLE 28 Individual Agreements ............................................................... 17

ARTICLE 29 Non-Discrimination .................................................................... 17

ARTICLE 30 Shortages ...................................................................................... 17

ARTICLE 31 Employee Liability ...................................................................... 18

ARTICLE 32 Change in Ownership or Management ...................................... 19

**Exhibit A**

## TABLE OF CONTENTS
(continued)

ARTICLE 33 Credit Union.............................................................................................. 20

ARTICLE 34 Drive Authorization and Deduction....................................................... 20

ARTICLE 35 Open Full-Time Positions ...................................................................... 20

ARTICLE 36 Location/Facility Classification ............................................................ 20

ARTICLE 37 Miscellaneous........................................................................................... 21

**Exhibit A**

## ARTICLES OF AGREEMENT

AGREEMENT made and entered into by and between ____ EZ Parking, LLC ____,
(hereinafter referred to as the "Employer"), and Auto Livery Chauffeurs, Embalmers, Funeral
Directors, Apprentices, Ambulance Drivers and Helpers, Taxicab Drivers, Miscellaneous Garage
Employees, Car Washers, Greasers, Polishers and Wash Rack Attendants, Motion Picture,
Theatrical, Exposition, Convention and Trade Show Employees, Pharmacists, Bus Drivers,
Parking Lot Attendants, and Hikers, Hotel Industry and Racetrack Industry Employees,
Newspaper, Magazine, Periodical Salesmen, Drivers, Division Men, District Managers,
Checkers, Vendors and Handlers, and Electronic Media Workers Chicago and Vicinity, Illinois
LOCAL 727, an affiliate of the I. B. of T. (hereinafter referred to as the "Union").

## ARTICLE 1
### Recognition

1.1     Notwithstanding the title or the Charter of the Union, it is agreed that the
Union, shall be the sole and exclusive bargaining agent for the following employees of the
Employer only:  All full-time and part-time employees who perform valet services at
locations which have no parking facilities.

1.2     It is agreed that this Agreement applies only to valet service locations which have no
parking facilities as defined in Article 36.  All locations which have parking facilities will be covered
under the commercial or residential contract with the Union (also referred to as the Parking Industry
Agreement), which is hereby incorporated by reference.

1.3     All work covered by this Agreement shall be performed by bargaining unit
employees.

## ARTICLE 2
### Union Security

2.1     It shall be a condition of employment that all employees of the Employer
covered by this Agreement who are members of the Union in good standing on the date on
which this Agreement is signed shall remain members in good standing, or pay fees in lieu
thereof, and those who are not members on the date on which this Agreement is signed shall,
on the thirty-first day following the date on which this Agreement is signed, become and
remain members in good standing in the Union, or pay fees in lieu thereof.  It shall also be a
condition of employment that all employees covered by this Agreement and hired on or after
the date on which the Agreement is signed shall, on the thirty-first day following the
beginning of such employment, become and remain members in the Union, or pay fees in
lieu thereof.

1

**Exhibit A**

2.2     When specifically authorized in writing by each employee, the Employer will deduct, from the first paycheck of each month, dues, and/or fees owing the Union and forward them to the Secretary-Treasurer of the Union, not later than ten (10) days after each monthly deduction. Such authorization, once given, shall be irrevocable for a period of not less than one (1) year or the term of this Agreement, whichever occurs sooner.

2.3     Upon hiring an employee or upon the request of the Union, it shall be the responsibility of the Employer to obtain from the employee a completed Application and Authorization form provided by the Union and an Enrollment Card provided by the Teamsters Local Union No. 727 Benefit Funds. The Employer will forward the same to the Union by the employee's thirty-first day of employment or within thirty (30) days after a request by the Union is made.

2.4     The Union agrees to further the interests of the Employer to the best of its ability.

## ARTICLE 3
### Uniforms

3.1     Should an employee be required to wear a uniform, the Employer agrees to furnish said uniforms, free of charge, and replace worn-out or damaged uniforms, free of charge. The Employer shall supply such employees with uniforms that, in the opinion of the Employer, are reasonable for the season in light of the specific requirements at each location.

3.2     Employees shall not be required to pay for uniforms or replacement uniforms or for a deposit for such uniforms or replacement uniforms; provided the Employer may deduct the cost of such uniform from the employee's final paycheck if the employee fails to return the uniform upon termination.

3.3     Identification badges will be issued to employees free of charge; provided that the Employer may charge an employee $5.00 for replacement of a lost badge.

## ARTICLE 4

### Seniority

4.1     Seniority shall mean length of continuous service from an employee's first day of continuous employment in the industry as a member of the Union. Separate seniority lists shall be maintained for full-time and part-time employees. Employees changing from one seniority list to the other shall go to the bottom of that seniority list. The Employer shall keep and make copies available to a representative of the Union accurate and up-to-date separate seniority lists, showing their names and first date of employment.

2

**Exhibit A**

Seniority is to prevail at all times, except that seniority shall not apply to foremen or to the selection of foremen.

All seniority shall be considered on a company-wide basis for purposes of lay-offs. In case of lay-offs, the last employee hired is to be the first laid off in respect to the separately maintained seniority lists. An employee laid off from one seniority list shall not use his seniority to replace an employee on the other seniority list except that a full-time employee may work part-time and retain his recall rights provided that there is no more senior part-time employee currently on layoff.

    4.2    Seniority shall be broken for any one or more of the following reasons:

    (a) Voluntary quit.

    (b) Discharge for cause.

    (c) Absence from work for three (3) consecutive working days without notifying the Employer unless prevented from doing so through no fault of the employee.

    (d) Failure to return to work after expiration of a leave of absence unless due to circumstances beyond the control of the employee or unless excused by the Employer.

    (e) Failure to return to work within seventy-two (72) hours following recall after layoff, which notice will be made by the Employer by certified letter to the employee's last known address according to the records of the Employer.

    (f) Lay off for a continuous period of more than six (6) months.

    (g) Engages in other employment while on an authorized leave of absence without the consent of the Employer.

    4.3    The first one hundred twenty (120) days of employment shall constitute a probationary period during which time an employee may be discharged at the sole discretion of the Employer. After one hundred twenty (120)) days, an employee's seniority date shall date from his or her first day of continuous employment in the industry as a member of the Union.

**Exhibit A**

## ARTICLE 5
### Grievance Procedure

5.1     Any complaint, grievance, or dispute arising under or concerning the meaning, application, or compliance with the terms of this Agreement shall first be taken up for adjustment by a representative of the Employer and a representative of the Union. The Employer and the Union shall meet at a time and place mutually agreed upon after the request by either party for such a meeting.

5.2     The following Grievance Procedure shall be followed in resolving said disputes:

STEP ONE:  Grievant will meet with Union Representative and Facility Manager as outlined above,

STEP TWO:  If failing to have the dispute resolved in STEP ONE, grievant will meet with a representative of the Union and a representative of the Employer at a mutually convenient time and place to resolve the grievance.

If the parties cannot agree, the issue may then be referred by the Union to arbitration as provided for in this Section. Any demand for arbitration must be made within forty-five (45) calendar days from the date of the Step 2 grievance meeting unless the parties mutually agree to extend said timeline.

5.3     Arbitration shall be by an arbitrator from the Federal Mediation and Conciliation Service ("FMCS"), and his or her decision shall be final and binding upon both parties and the employee(s). The Union shall request a panel of seven (7) arbitrators who are members of the National Academy of Arbitrators within the Chicago Geographical Region. The parties will alternate striking arbitrator names until one is chosen. The identity of the party which shall strike first shall be determined by a coin toss. The Union and the Employer will each be responsible for one-half of the cost for such arbitration proceeding. All other expenses of the arbitration shall be assumed by the party incurring them. The arbitration hearing will not be transcribed except when the arbitrator may deem necessary. At the conclusion of the hearing, the arbitrator will issue a decision with any award in writing.

**In lieu of FMCS arbitration provided for above, the parties may agree to an expedited Grievance Panel. Such Grievance Panel shall be selected within ten (10) business days from the receipt of the written statement of grievance, and shall consist of one (1) person selected by the Chicago Parking Association who is not a representative of the Employer against whom the grievance was filed, and one (1) person selected by the Union, and shall endeavor to settle the matter. The Grievance Panel shall meet within ten (10) business days after being selected and shall render their decision within ten (10) business days after the meeting. Unanimous decisions by the Grievance Panel shall be final and binding on the parties, and there shall be no further recourse to Arbitration procedures or court litigation. If said Grievance Panel fails to resolve the matter within thirty (30) business days after it is referred to the Grievance Panel, the**

4

**Exhibit A**

matter may be submitted by the Union to arbitration as outlined above in Section 5.3. The fees and expenses of the Grievance Panel shall be divided equally between the Union and the Employer.

5.4     The Employer must be notified of a monetary grievance within thirty (30) days after knowledge of the alleged violation or it shall be waived.

5.5     A non-monetary (policy) grievance must be filed in writing within ten (10) days after knowledge of the alleged violation or it shall be waived.

## ARTICLE 6
### Discipline and Discharge

6.1     No employee who has completed his or her probationary period will be discharged or disciplined except for just cause.

6.2     The Union shall have the right to investigate the reasons for any discharge or discipline and to protest the same through the grievance and arbitration procedure.

6.3     An employee must be notified as soon as possible of any disciplinary action.

## ARTICLE 7
### Strikes and Lockouts

7.1     The Union agrees that there shall be no strike, slow-down, or cessation of work. There shall be no picketing, hand billing or boycott of the Employer's customers. The Employer agrees there shall be no lockout during the term of this Agreement.

The provisions of this section shall not apply to employers which have failed for six consecutive months to pay the contributions due to the Benefit Plans which are not in dispute or to submit dues.

7.2     Should there be an unauthorized strike, slow-down, walk-out, or other unauthorized cessation of work, the Union shall not be liable for damages resulting from such unauthorized acts from its members, and the Union shall undertake every reasonable means to induce the employees to immediately return to their jobs.  In the event of an unauthorized strike, slow-down, walk-out, or any unauthorized cessation of work, the Employer shall have the sole and exclusive right to discipline or discharge the employees who participate in such an event.

7.3     No employee covered by this Agreement shall be required to go through a picket line when the picket line is approved by Teamsters' Joint Council No. 25.

5

**Exhibit A**

## ARTICLE 8
### Wages

8.1    Effective July 1, 2018 all employees covered by this Agreement are guaranteed to receive the following wage rates effective as indicated.

> July 1, 2018...............$11.00
> July 1, 2019...............$12.00
> July 1, 2020...............$13.00

Employees employed in the City of Chicago covered by this Agreement are guaranteed to receive the following wage rates effective as indicated.

> July 1, 2018...............$12.00
> July 1, 2019...............$13.00
> July 1, 2020...............$13.20 (or an amount equal to the CPI for the prior 12 months-- not to exceed 2.5% -- whichever of the two amounts is larger)

Employees who make above the guaranteed wage rate set forth above on July 1 of the respective calendar year shall receive an increase in their wage rate as follows:

> July 1, 2018...............$.40
> July 1, 2019...............$.40
> July 1, 2020...............$.40

Employees shall not receive two increases on July 1 of any calendar year.

Employees hired after the effective date of this Agreement shall receive the guaranteed wage rate as set forth above and thereafter shall receive the wage rate increases provided herein.

## ARTICLE 9
### Holidays

9.1    Regular full-time employees shall receive additional compensation for the six (6) holidays listed below equal to their normal workday hours but not less than eight (8) hours pay at their regular daily straight-time rate of pay.  Those employees who are scheduled and do work on any of these six (6) holidays will receive their regular daily straight-time rate of pay in addition to time and one-half (1 ½) per hour for all hours actually worked on said six (6) holidays.  To be entitled to holiday pay under this clause, the employee must work for the Employer six (6) months and work his or her scheduled workday before and his or her scheduled workday after said holiday if the employee is scheduled to work.  An employee who is scheduled to work on a holiday but fails to report to work shall forfeit his or her right to holiday pay unless his or her absence is due to

6

**Exhibit A**

extenuating circumstances. For the purpose of holidays and overtime pay on holidays, the below listed holidays will be celebrated on the days they fall on unless otherwise specified by law:

Memorial Day
Fourth of July
Labor Day
Thanksgiving Day
Christmas Day
Employee's Birthday

A holiday for which an employee is paid and during which he or she did not work shall be considered as time actually worked by him or her under the terms of this Agreement. No employee shall receive holiday pay unless he or she has attained six (6) months' seniority with the Employer on or before the date of the holiday. Part-time employees, when working on said holidays, shall be entitled to time and one-half (1 ½) per hour for hours worked. All work performed on the sixth (6th) day of a holiday week shall be paid at the overtime rate.

The additional compensation for each holiday (holiday pay) for part-time employees shall be based upon the average weekly hours scheduled and paid during the two (2) calendar months preceding the Holiday as follows:

| Weekly Hours Scheduled | Holiday Pay |
|---|---|
| Up to 19 hours | 2 hours |
| 20 to 29 hours | 4 hours |
| 30 to 39 hours | 6 hours |

### ARTICLE 10
### Military Service

10.1    Employees who become members of the U.S. Armed Services shall have such rights of reemployment as may be prescribed by the Uniformed Services Employment and Reemployment Rights Act.

### ARTICLE 11
### Jury Duty

11.1    Employees on the payroll with ninety (90) days or more of service will be reimbursed for any loss of income incurred during the time spent on jury service with a maximum of ten (10) days annually.

7

**Exhibit A**

## ARTICLE 12
### Sick and Personal Leave

12.1    A full-time employee who has worked for the Employer for six (6) months or longer shall be entitled to seven (7) combined sick and/or personal days per year at the employee's normal rate of pay for their normal workday hours but not less than eight (8) hours per day.  Effective January 1, 2021, employees will be entitled to eight (8) combined sick and personal days per year.

12.2    A part-time employee who has worked for the Employer for six (6) months or longer shall be entitled to seven (7) combined sick and/or personal days per year based upon the average weekly hours scheduled and paid during the two (2) calendar months preceding the sick or personal day as follows:

| Weekly Hours Scheduled | Personal/Sick Leave Pay |
|---|---|
| Up to 19 hours | 2 hours |
| 20 to 29 hours | 4 hours |
| 30 to 39 hours | 6 hours |

Effective January 1, 2021, part-time employees will be entitled to eight (8) combined sick and personal days per year.

12.3    The employee shall give one week's notice to the Employer for days used for personal leave.  The employee shall phone a designated phone number and if no answer, a designated back-up phone number at least two (2) hours before his or her regularly scheduled starting time for days used for sick leave.  Combined sick and/or personal days shall be noncumulative.

12.4    The provisions of this Article 12 shall be in lieu of the rights and benefits provided under the City of Chicago and the Cook County Sick Leave Ordinances (or the ordinances of any other jurisdiction) and the parties agree that the Union and the employees waive any and all rights under those Ordinances.

## ARTICLE 13
### Funeral Leave

13.1    A regular full-time employee who may lose time from his or her employment due to a death in his or her immediate family shall be entitled to receive his or her regular pay during said absence for four (4) days.  Immediate family members are defined to be father, mother, brother, sister, spouse, child, father-in-law, mother-in-law, or grandparents.

13.2    In order to qualify for funeral pay, the employee must have worked for the Employer for six (6) months or longer.

8

**Exhibit A**

13.3   Employees must, upon request from the Employer, furnish satisfactory proof of death and relationship.

13.4   Funeral leave shall only be granted for the purpose of attending the funeral of the deceased, grieving, and settling the affairs of the deceased.

## ARTICLE 14
### Vacations

14.1   Employees shall receive vacation in accordance with the following schedule:

After one (1) year of continuous employment, one (1) week vacation
After three (3) years of continuous employment, two (2) weeks vacation
After twelve (12) years of continuous employment, three (3) weeks vacation

14.2   An employee's vacation time may be split upon mutual agreement between employee and Employer. At least one (1) continuous week must be taken each year. Vacations shall be scheduled between January 1 and December 31 of each year.

14.3   (a) A vacation bank shall be established for each employee, into which employees shall begin to accrue vacation pay on a monthly basis in accordance with paragraph 14.3 (b), below.

(b) Vacation pay and time shall be earned on a monthly basis in accordance with the following schedule:

After one (1) year of employment: .417 vacation days per month (equivalent to, one (1) week vacation):
Beginning with the first month of employment and continuing through the month prior to the month in which the employee completes two (2) years of employment (1st month through 36th month of employment), employees accrue .417 vacation days with pay per month in which the employee actually performs work or takes paid time off.

After three (3) years of employment, .834 vacation days per month (equivalent to two (2) weeks vacation):
Beginning with the month in which the employee completes three (3) years of employment and continuing through the month prior to the month in which the employee completes twelve (12) years of employment (37th month through 144th month of employment), employees accrue .834 vacation days with pay per month in which the employee actually performs work or takes paid time off.

9

**Exhibit A**

> After twelve (12) years of employment, 1.25 vacation days per month (equivalent to three (3) weeks vacation):
> Beginning with the month in which the employee completes twelve (12) years of employment (145th month of employment) employees accrue 1.25 vacation days with pay per month in which the employee actually performs work or takes paid time off.

(c) The month in which employment begins and the month in which employment ends shall be considered a full month for purposes of this Section.

(d) Employees shall be entitled to use vacation time with pay, immediately after accruing it.

(e) Every December 31st, each employee shall be given the option of a payout or carry over of unused vacation days in his or her vacation bank; provided, however, that the carry over will be limited to accruals in the prior twelve (12) months. Should the employee receive a payout, such employee shall receive the payout on the next scheduled pay period.

(f) Employees shall receive an accounting of all their accrued vacation, no less frequently than monthly.

14.4  Vacation pay for part-time employees shall be prorated in accordance with the above schedule.

14.5  Employees shall be paid their accrued vacation pay prior to the time they leave on vacation.

14.6  Preference by seniority shall be given to an employee's choice of vacation period.

14.7  Employees shall receive vacation pay on the basis of average hours worked in the previous year. All hours worked or paid for (combined sick and/or personal days, holidays, sick leave, bereavement pay) shall be considered as hours worked in determining compensation.

14.8  Vacation checks shall be issued separately.

Exhibit A

## ARTICLE 15
### Leave of Absence

15.1     The Employer may, at its sole discretion, grant a personal leave of absence to an employee with seniority provided:

> (a) The employee requests the leave, in writing, at least one (1) week in advance of such a leave, unless there was no possibility that the employee had such prior knowledge of the necessity of the leave. Approved leaves shall be in writing with a copy to the Union; and

> (b) The leave is for a specified time not to exceed thirty (30) calendar days in duration which may be extended for an additional specified time not to exceed an additional thirty (30) calendar days in duration at the sole discretion of the Employer.

> (c) Upon the expiration of an employee's authorized personal leave of absence, said employee shall be reinstated with full seniority to the same or substantially equivalent employment.

15.2     The Employer may implement the Family Medical Leave Act (FMLA) consistent with applicable law, and the provisions of this section. The Employer shall grant family and medical leaves to employees entitled by law to such leaves.

15.3     The Employer shall continue to contribute to the Health and Welfare Fund during FMLA leaves, to the extent required by law or alternatively, the Employee shall remain covered by the Employer's health insurance plan during FMLA leaves as though the employee were actively at work.

15.4     In all cases of medical leave, regardless of whether they are FMLA leaves, the Employer may require employees to submit to medical examinations by a physician chosen by the Employer at the Employer's expense, during the leave and before the employee returns to work.

15.5     Upon expiration of an authorized medical or family leave an employee shall be reinstated with full seniority to the same or substantially equivalent employment (unless the employee would have been laid off or terminated had the employee not taken a leave). It is understood that employees returning to work from a leave (or any illness or injury) must be able to acceptably perform all essential job functions and may not constitute a threat to safety.

11

**Exhibit A**

## ARTICLE 16
### Hours of Work

16.1    Full-time employees covered by this Agreement who are called to work shall receive not less than six (6) hours work or its equivalent per day.

16.2    All regular full-time employees covered by this Agreement, shall be guaranteed a workweek consisting of forty (40) hours exclusive of one-half (1/2) hour for a lunch period each day.

16.3    Any regular employee shall forfeit his or her weekly guarantee in that week in which he or she takes off a regularly scheduled workday or any portion thereof on his or her own initiative or when an employee is discharged for cause.  However, an employee, before leaving the Employer's premises, shall be required to punch out.

16.4    Overtime [time and one-half (1 ½)] shall be paid for all hours worked over forty (40) hours in any one week exclusive of the thirty (30) minute lunch period each day. If an Employer has any employees covered by the Fair Labor Standards Act, overtime shall be paid in accordance with said Act and at least thirty (30) minutes shall be allowed each day without pay for an employee's lunch period.

16.5    When feasible, the Employer shall post the employee's schedule at least seven (7) days in advance.


## ARTICLE 17
### Transfers

17.1    The Employer may assign duties to any employee as dictated by business conditions.


## ARTICLE 18
### Driver's License

18.1    All employees shall continuously have and shall exhibit to the Employer upon request a valid Driver's License issued by any State within the United States.  Any employee found not to have a valid Driver's License in his or her possession will be suspended without pay for up to ninety (90) days until a valid license is presented.  After that time, the employee may be subject to termination.  An Employee whose license is suspended or revoked must report the loss or suspension of his/her license.  An employee who makes a timely report will be suspended without pay for up to ninety (90) days until a valid Driver's License is presented. After ninety (90) days the employee will be placed on a preferential rehire list for up to six (6) months.  An employee who fails to make a timely report as to the loss or suspension of his/her License and who is involved in an accident or who is ticketed by a traffic control officer while on duty will be terminated.

12

**Exhibit A**

**ARTICLE 19**
**Health and Welfare and Legal and Educational Assistance**

19.1    Health and Welfare

(a)     During those period(s) that the Affordable Care Act as amended from time
to time is not in effect, as least to the extent an Employer is not obligated
to provide health insurance coverage under it, the Employer shall
contribute to Teamsters Local Union No. 727 Health and Welfare Fund on
account of each employee covered by this Agreement $80.00 per month:
This amount shall be increased each March 1 by $5.00 per month as
follows:

March 1, 2019..............$85.00 per month
March 1, 2020..............$90.00 per month
March 1, 2021..............$95.00 per month

Commencing the first of the month in which the Affordable Care Act as
amended from time to time obligates the Employer to provide any current
or future fulltime employee of the Employer healthcare coverage under the
eligibility criteria providing the latest possible date or hours of work the
Employer shall cease to have any obligation to make contributions under
this Paragraph 19.1 (a) on behalf of its fulltime employees. Its obligation
to make payments on behalf of part time employees shall continue,
however.

(b)     During those periods the Affordable Care Act as amended from time to
time obligates the Employer to provide healthcare coverage to any one of
its current or future eligible fulltime employees (or would obligate the
Employer to do so absent the minimum employee requirements), the
Employer shall contribute $380 per month to the Teamsters Local 727
Health & Welfare Fund on account of each such eligible fulltime
employee covered by this Agreement who actually performs work during
the calendar month.  The obligation to make contributions shall be
determined on an individual by individual employee basis.  Payments
under this paragraph and paragraph 19.1(a) above shall not be duplicated.
The amount of the monthly premium may be increased by the Trustees of
the Teamsters Local 727 Plan up to a maximum of four hundred sixteen
dollars ($416.00) effective March 1, 2019 and 6.5% of the monthly
premium ($416.00)  March 1,2020 and an additional 6.5% each March 1
thereafter.

13

**Exhibit A**

The determination period for determining whether an employee is a full-time employee for purpose of the Affordable Care Act shall be the calendar year. Similarly, the stability period for an employee receiving healthcare coverage shall be the calendar year. The determination period for employees hired during any calendar year after the Affordable Care Act becomes effective shall be the longest possible period permitted by the Affordable Care Act

(c)    Contributions due under Paragraph 19.b above to the Health and Welfare Fund for all fulltime Employees shall commence at the latest possible date or hours of work but not to exceed six (6) months.

Any fulltime employee otherwise eligible to receive health care coverage under Article 19(b) may opt out of coverage and shall receive a stipend of two hundred dollars ($200.00) per month in lieu thereof. The Employer shall have no obligation to make any contribution to any Teamsters Local 727 Health and Welfare Plan on behalf of opt-out employees. The opt-out will be by signature on a form prepared by the Employer, and the opt-out will be effective until the employee notifies the Employer in writing that he/she has experienced a loss of coverage due to a life altering event and wishes to begin receiving health care coverage.

(d)    In the event the health care coverage provided through the Teamsters Local 727 Plan does not meet the standards imposed by the Affordable Care Act or its implementing regulations, the Union agrees to indemnify the Employer for any penalties or other monetary consequences which result. If the Union does not compensate the Employer for its losses or the Teamsters Local 727 Plan is not made compliant, the Employer may withdraw from continued participation in the Plan, provided it provides Plan Participants with uninterrupted coverage under the Employer's health plan.

19.2    Legal and Educational Assistance

(a)    If the Employer is not a Contributing Employer as defined in Section 19.2(b), the Employer shall contribute to the Teamsters Local Union No. 727 Legal and Educational Assistance Fund on account of each employee covered by this Agreement the following:

Commencing July 1, 2018.................$112.00 per month which shall be adjusted each March 1 to the amount of the contribution required by the Parking Industry Agreement.

(b)    A Contributing Employer means an Employer who is obligated to make contributions to the Legal and Educational Assistance Fund pursuant to the terms of the Collective Bargaining Agreement between the Union and

14

**Exhibit A**

the Employer covering residential and commercial locations (referred to as the Parking Industry Agreement).

19.3    Contributions due hereunder to the Health and Welfare and Legal and Educational Assistance Funds for all employees for which contributions are due shall commence with the month of their employment.

19.4    No contributions to the Health and Welfare Fund or Legal and Educational Assistance Fund shall be required on behalf of any employee who is on a leave of absence, except to the extent required by law.

19.5    By the execution of this Agreement, the Employer authorizes the Trustees to enter into appropriate trust agreements necessary for the administration of such Funds, and hereby waiving all notice thereof and ratifying all actions already taken or to be taken by such Trustees within the scope of their authority.

19.6    It is also agreed that in the event the Employer is delinquent at the end of a month in the payment of its contributions to the Health and Welfare Fund or Legal and Educational Assistance Fund, in accordance with the rules and regulations of the Trustees of such Fund, the employees or their representatives shall have the right to take such action as they deem necessary until such delinquent payments are made, and it is further agreed that in the event such action is taken, the Employer shall be responsible to the employee for losses resulting therefrom.

19.7    Should the Trustees of the Health and Welfare Fund or Legal and Educational Assistance Funds audit the records of the Employer, such audit shall not exceed: three (3) years from the date the notice of the audit in the case of an Employer which is signatory to the Parking Industry Agreement or seven (7) years in all other cases.

## ARTICLE 20
## Labor Management Committee

20.1    The Employer agrees to contribute four dollars ($4.00) per month to the Parking Industry Labor Management Committee (PILMC) for each employee covered by this Agreement.

## ARTICLE 21
## Teamsters-National 401(k) Savings Plan

21.1    The Employer hereby agrees to participate in the Teamsters - National 401(k) Savings Plan ("the Plan") on behalf of all employees represented for purposes of collective bargaining under this Agreement. The Employer will make or cause to be made payroll deductions from participating employees' wages, in accordance with each employee's salary deferral election subject to compliance with ERISA and the relevant tax code provisions.

15

**Exhibit A**

The Employer will forward withheld sums to the Plan at such time, in such form and manner as required pursuant to the Plan and Declaration of Trust (the "Trust"). The Employer will execute a Participation Agreement with the Union and the Trustees of the Plan evidencing employer participation in the Plan effective prior to any employee deferral being received by the Plan. In addition, the Employer agrees to require the payroll system provide separate paycheck deductions so that the Plan may allow participant loans. The Employer further agrees, at such times as it is administratively feasible to require the payroll system to provide separate paycheck deductions so that the Plan may allow after-tax contributions.

## ARTICLE 22
### Management Rights

22.1    All rights, powers, and authority customarily exercised by the Employer are retained and reserved by the Employer except as otherwise specifically modified by express provisions of this Agreement.

## ARTICLE 23
### Doctors' Examinations

23.1    All doctors' examinations requested by the Employer will be paid for by the Employer. In the event the employment of the employee is terminated on the basis of the report of the Employer's doctor, or in the event of questionable status of employee's health upon being rehired due to a layoff, the Union may, at its own cost, have such report checked by a doctor of its election.

## ARTICLE 24
### Time Records

24.1    The Employer shall keep accurate time records and make them available for inspection by the Union upon request so that there will be no misunderstanding about the employee's time.

## ARTICLE 25
### Access to Facility

25.1    Authorized agents of the Union shall have access to the Employer's establishment during working hours for the purpose of adjusting disputes and investigating working conditions; provided, however, that there is no interruption of the Employer's business operations.

16

**Exhibit A**

## ARTICLE 26
### Payday

26.1    Payday shall be at least as often as semi-monthly (twice monthly). Employees must receive a paper or electronic paycheck; an employer is prohibited from paying an employee in cash.

## ARTICLE 27
### Maintenance of Benefits

27.1    Employees covered by this Agreement receiving wages or conditions (excluding overtime) over and above those listed in this Agreement shall suffer no economic loss as the result of signing this Agreement. No employee covered by this Agreement shall receive less than the terms and conditions therein specified.

## ARTICLE 28
### Individual Agreements

28.1    There shall be no side deals or agreements, whether orally or in writing, between any Employer and employee or between Employers. No employee or Employer, either orally or in writing, shall enter into any agreement, contract, or arrangement covering any employment to which this Agreement applies which is contrary to or conflicting with the terms and conditions of this Agreement.

## ARTICLE 29
### Non-Discrimination

29.1    It is the policy of both the Employer and the Union to comply with all Federal and State Equal Employment Opportunity Laws and not to discriminate against any employee because of race, sex, color, religion, national origin, age, or membership or non-membership in the Union, or other protected characteristic.

## ARTICLE 30
### Shortages

30.1    Employees shall be accountable for all receipts collected by them and responsible for their errors in the collection of parking tickets. Employers shall have the right to summarily dismiss an employee for stealing, misrepresentation of the receipts, or for failure to explain to the satisfaction of the Employer repeated errors in parking tickets, reports, and collections, except as set forth below.

17

**Exhibit A**

30.2    Employees shall be informed of their shortages, if any, within thirty (30) days after discovery of the shortage, but in no event later than sixty (60) days after the shortage occurred.  Shortages, if any, shall be recovered within two (2) pay periods after the employee is notified of the shortage, or longer if required by law.

30.3    In the event of shortages of $5.00 or more, the Employer will follow the progression of discipline set forth below when appropriate, subject to such facts as may be present in each case, and subject to the just cause requirement of the collective bargaining agreement:

GUIDELINES

| CASHIER SHORTAGE OCCURRING IN A SINGLE YEAR | ACTION TO BE TAKEN GENERALLY APPLIED |
|---|---|
| 1st | Oral Warning |
| 2nd | Written Warning |
| 3rd | 3-Day Suspension without pay |
| 4th | Discharge |

30.4    It is understood that the foregoing constitute agreed-upon disciplinary guidelines.  However, if unusual situations or extenuating circumstances are present, the situation may warrant consideration of deviation from the guidelines based upon all the facts available for review.  Accordingly, these guidelines are intended to be used as a guide for the considered judgment of supervisory personnel who must in each case view all of the facts of an employee shortage in their proper context.

30.5    If the employee disagrees with the shortage charge, the matter may be processed through the grievance procedure.

**ARTICLE 31**
**Employee Liability**

31.1    Except as provided for in Article 30, no employee shall be held financially responsible for damages incurred in the performance of his or her daily duties.

31.2    No employee shall be charged for any insurance premiums or for any deductibles or costs related to any insurance claim or any other claim of damage to person or property.

18

**Exhibit A**

## ARTICLE 32
### Change in Ownership or Management

32.1    In the event an Employer acquires, loses, closes, or anticipates losing a location which falls within the scope of this Agreement, the Employer will give the Union fifteen (15) days written notice prior to the effective date thereof, or immediate written notice if the acquisition or loss is to take place in less than fifteen (15) days, and said Employer will meet at the Union's request before the acquisition or loss to discuss all matters pertinent to said acquisition or loss.

32.2    Any employee who has continuously worked at a location for one hundred eighty (180) days or more will be retained by the acquiring Employer when an Employer acquires a new location. In order for an employee to be retained by the acquiring Employer the employee must respond to the new Employer in a reasonable amount of time. The Change of Location form must contain the names and current contact information of all employees at the location including those employees on leave. An Employer's failure to include an employee on the Change of Location form will obligate the Employer (who must have at least two remaining locations) to retain the omitted employee. The Employer losing the location will be obligated to retain all other employees.

Full time employees of the Employer losing the location who work less than 20 hours per week on average at the location being transitioned shall be retained by the Employer losing the location. Full time employees of the Employer losing the location who work 20 hours or more per week on average at the location being transitioned shall be retained by the acquiring Employer and shall be provided with a full-time schedule which can be created by laying off a part time employee elsewhere.

32.3    Within fifteen (15) days of the loss of a location, the Employer who lost the location shall pay to employees who are retained by the acquiring Employer the pro-rate value of all vacation, combined sick and/or personal days, and compensation earned under this Agreement but not taken and/or paid.

In addition, the Employer who lost the location shall pay the respective benefit funds any amounts owed up to the last day actually worked. The acquiring Employer shall provide said employees with corresponding time-off without pay. Upon commencing employment with the acquiring Employer, employees shall be credited with all seniority, as described in Article 4, Section 4.1, as though there had not been an Employer change.

**Exhibit A**

## ARTICLE 33
### Credit Union

33.1    The Employer agrees to deduct from the employee's regular paycheck and forward to the credit union designated by the Union such sums as the employee may voluntarily decide to deposit.  The employee will notify the Employer by written authorization of his or her desire.  Such deduction will be on a semi-monthly basis and forwarded to the credit union.

## ARTICLE 34
### Drive Authorization and Deduction

34.1    The Employer agrees to deduct from the paycheck of all employees covered by this Agreement voluntary contributions to DRIVE.  DRIVE shall notify the Employer of the amounts designated by each contributing employee that are to be deducted from his or her regular paycheck on a semi-monthly basis.  The Employer shall transmit to DRIVE National Headquarters on a monthly basis, in one check the total amount deducted along with the name of each employee on whose behalf a deduction is made, the employee's Social Security number and the amount deducted from the employee's paycheck,

## ARTICLE 35
### Open Full-Time Positions

35.1    Any full-time positions that become open must be offered to part-time employees at that location by seniority.

## ARTICLE 36
### Location/Facility Classification

36.1    The parties recognize that it is necessary to classify locations/facilities for purposes of this Agreement and the Agreement applicable to commercial and residential locations (also referred to as the Parking Industry Agreement).  All locations/facilities that are covered under these Agreements as of November 1, 2001 will retain their current classification. Any location or facility not covered by these Agreements as of November 1, 2001 will be classified by mutual agreement between the Employer and the Union using the following guidelines:

> (a) Commercial:  All locations in which fifty percent (50%) or more of the vehicles parked at the location belong to the general public are commercial locations. Commercial locations include locations with valet parking services where there is any parking space in the building where the location exists.

20

**Exhibit A**

(b) Residential: All locations of employer members of Apartment Building Owners and Managers Association of Illinois and all other locations in which more than 50% of the vehicles parked at the location belong to residents of the property are residential locations.

(c) Valet: All locations that strictly provide valet parking services without any physical parking facility are valet locations and are covered by the Agreement covering valet service locations.

36.2    The Employer and the Union agree that employees employed as bellmen or doormen will be covered under the classification for the location where they are employed.

## ARTICLE 37
### Miscellaneous

37.1    No employee shall be required to take a polygraph or behavioral analysis test without his or her consent as a condition of employment.

37.2    Employees may not be required to perform janitorial services; however, in accordance with past practices, employees may be directed to clean immediate areas visible to customers.

37.3    An employee may not be discharged or disciplined because his or her earnings have been subjected to two (2) or less wage garnishment deduction orders within one (1) year.

37.4    Drug and alcohol testing will only be permitted for (1) probationary employees, and (2) reasonable suspicion under the terms and conditions of the Drug and Alcohol Policy and Testing Program agreed to by the Employer and the Union.

37.5    The Union agrees that in the event any agreement is executed by the Union with any other Parking Industry Employer which provides for a lower wage rate, reduced benefits, or changed working conditions than those provided in this Agreement, then the Employer may have such lower wage rates, or reduced benefits, or changed working conditions substituted in this Agreement. The Union shall provide advance, written notice to the Chicago Parking Association in the event it requests any exceptions to this provision for any newly organized Employer, or for any Employer who has not previously been signatory to an agreement with the Union.  Upon receipt of such notice, the Chicago Parking Association agrees to designate representatives to meet and confer with the Union regarding this request. If the Chicago Parking Association does not respond, within seven (7) working days, to such a request by the Union, then the Union may enter into any such agreement without agreement from the Employer.

21

**Exhibit A**

THIS AGREEMENT shall be binding upon and inure to the benefit of the parties hereto and their respective administrators, executors, successors and assigns.

THIS AGREEMENT shall go into effect July 1, 2018, and shall continue in full force and effect until and including June 30, 2021, and shall continue thereafter on an annual basis from year to year unless written notice of desire to amend the Agreement is given by either party sixty (60) days prior to June 30, 2021 or sixty (60) days prior to June 30 of any subsequent year.

EXECUTED at Chicago, Illinois, this _19_ day of _June_____, 201_9_.

FOR THE EMPLOYER                          FOR THE UNION

_Ahmad Bamboyand_                         _____

22

**Exhibit A**

## LETTER OF UNDERSTANDING

This Letter of Understanding is entered into between _____EZ Parking, LLC_____ and Teamsters Local 727, and is hereby attached to the parties' collective bargaining agreement that is in effect from July 1, 2018 through June 30, 2021.

The parties acknowledge that the national healthcare legislation that has been enacted may impact the Health and Welfare provisions of their existing collective bargaining agreement. To that end, the parties agree that following the issuance of any meaningful substantive changes to the current regulations but before the effective date of the "employer penalties" they will meet and confer to discuss the impact, if any, that such legislation or change in regulation(s) has on their respective obligations under the terms of their agreement.

Nothing within this Letter of Understanding shall be construed to alter or amend the terms of the parties' collective bargaining agreement, including, but not limited to, Article 7. All provisions of the parties' collective bargaining agreement shall remain in full force and effect through its expiration date of June 30, 2021.


EXECUTED at Chicago, Illinois, this _19_ day of _____June_____, 201_7_.


FOR THE EMPLOYER                    FOR THE UNION

_____          _____


23

**Exhibit A**

## LETTER OF UNDERSTANDING

This Letter of Understanding is entered into between _____ EZ Parking, LLC _____ and Teamsters Local 727, and is hereby attached to the parties' collective bargaining agreement that is in effect from July 1, 2018 through June 30, 2021.

The parties agree that, notwithstanding any provision to the contrary in their collective bargaining agreement, during the first three (3) months (January, February, and March of each calendar year, the Employer may require of any bargaining unit employee one or the other, but not both, of the following:

1. To be involuntarily furloughed for up to three (3) weeks (one (1) day per week for up to fifteen (15) weeks) of an employee's equivalent annual vacation entitlement during this three (3) month period. Any bargaining unit employee selected for this involuntary furlough may elect to use any earned vacation for any of these furloughed hours, in lieu of an absence without pay. If an employee so elects to use their earned vacation pay, they may still request unpaid time off during the remaining nine (9) months of any calendar year.

2. To have a full-time schedule reduced to 32 hours.

EXECUTED at Chicago, Illinois, this _19_ day of _June_, 201_9_.

FOR THE EMPLOYER                    FOR THE UNION

_[signature]_                       _____

24

**Exhibit A**

## LETTER OF UNDERSTANDING

This Letter of Understanding is entered into between __EZ Parking, LLC__ and Teamsters Local 727, and is hereby attached to the parties' collective bargaining agreement that is in effect from July 1, 2018 through June 30, 2021, commonly referred to as the "Valet Agreement".

The parties acknowledge that the obligation that dependent health care coverage be provided due to the enactment of the national healthcare legislation known as the Affordable Care Act is now in effect and agree that it has in fact had an impact on the cost of the healthcare coverage available from the Teamsters Local 727 Plan described in the Health and Welfare provisions of the Valet Agreement. In lieu of the Employer withdrawing from the Teamsters Local 727 Plan, the parties agree that so long as the Employer mandate remains in effect:

The Employer will withhold from the paychecks of bargaining unit members the monthly amount determined by the Trustees of the Teamsters Local 727 Plan as sufficient to provide ACA compliant dependent (children only) coverage for employees who enroll in the Teamsters Local 727 Plan which shall not be less than $380.00

For the duration of the Valet Agreement, the Employer shall make a monthly payment of $170.00 on behalf of each employee who is participates in the Local 727 Plan and who selects dependent coverage.

The monthly amount the employee is obligated to contribute to the Local 727 Plan will be withheld in equal amounts from each anticipated paycheck based on the number of pay periods in a calendar month.

In the event an employee does not have sufficient earnings in a particular paycheck or does not receive a paycheck the Employer will not be under an obligation to withhold from that particular pay period. In that event, the employee will be obligated to make arrangements with the Fund Office to make the appropriate contribution to the Local 727 Plan.

Employees may continue to exercise the right to opt out of coverage.

Nothing within this Letter of Understanding shall be construed to alter or amend the terms of the parties' collective bargaining agreement, including, but not limited to, Article 7. All provisions of the parties' collective bargaining agreement shall remain in full force and effect through its expiration date of June 30, 2021.

EXECUTED at Chicago, Illinois, this _19_ day of _June_, 201_9_.

FOR THE EMPLOYER                    FOR THE UNION

_Ahmad Bombaypoui_                  _____

25

**Exhibit A**

# TEAMSTERS LOCAL UNION NO. 727



## EZ PARKING

### FEBRUARY 1, 2019 – OCTOBER 31, 2021

**Exhibit A**

## ARTICLES OF AGREEMENT

AGREEMENT made and entered into by and between _____ **EZ PARKING** _____ (hereinafter referred to as the "Employer"), and AUTO LIVERY CHAUFFEURS, EMBALMERS, FUNERAL DIRECTORS, APPRENTICES, AMBULANCE DRIVERS AND HELPERS, TAXICAB DRIVERS, MISCELLANEOUS GARAGE EMPLOYEES, CAR WASHERS, GREASERS, POLISHERS AND WASH RACK ATTENDANTS UNION, MOTION PICTURE, THEATRICAL, EXPOSITION, CONVENTION AND TRADE SHOW EMPLOYEES, PHARMACISTS, BUS DRIVERS, PARKING LOT ATTENDANTS, AND HIKERS, HOTEL INDUSTRY AND RACETRACK INDUSTRY EMPLOYEES NEWSPAPER MAGAZINE, PERIODICAL SALESMEN, DRIVERS DIVISION MEN DISTRICT MANAGERS CHECKERS VENDORS AND HANDLERS, AND ELECTRONIC MEDIA WORKERS, CHICAGO AND VICINITY, ILLINOIS LOCAL 727, an affiliate of the I.B. of T. (hereinafter referred to as the "Union"). It is understood that this Agreement also applies to Apartment Building Owners and Managers Association ("ABOMA") and is made and entered into by ABOMA on behalf of such of its member buildings as are listed on Schedule A which ABOMA has presented to the Union and that each of the members of ABOMA as now are or may hereafter become parties hereto is the Employer.

## ARTICLE 1
## RECOGNITION

1.1     It is agreed that the Union shall be the sole and exclusive bargaining agent for all employees of the Employer, including, but not limited to: Cashiers, hikers, attendants, porters, maintenance men/custodians, drive men, washers, collectors, customer service representatives (excluding those who do sales and/or marketing), drivers, dispatchers, bellmen, doormen and supervisors who perform bargaining unit work, but excluding clerical employees, guards, professional employees and supervisors as defined in the National Labor Relations Act, who do not perform bargaining unit work.

1.2     The Employer agrees not to discriminate in any way against any members of the Union.

1.3     The Employer shall assign the work covered under this Agreement to employees covered by this Agreement as described in Article 1, Section 1.1 of this Agreement. Non-bargaining unit employees, including supervisors, shall not regularly perform bargaining unit work normally assigned to employees in job classifications covered by this Agreement; provided, however, that they may perform such work in emergencies or in the instruction and/or training of employees. Nothing in this Article shall be construed to limit the Employer's ability to subcontract out maintenance and construction projects.

1.4     Should a new classification arise, the parties agree to meet and negotiate terms and conditions of employment for such new classification.

## ARTICLE 2
## UNION SECURITY

2.1     It shall be a condition of employment that all employees of the Employer covered by this Agreement who are members of the Union in good standing on the date on which this Agreement is signed shall remain members in good standing, or pay fees in lieu thereof, and those who are not members on the date on which this Agreement is signed shall, on the thirty-first day following the date on which this Agreement is signed, become and remain members in good standing in the Union, or pay fees in lieu thereof. It shall also be a condition of employment that all employees covered by this Agreement and hired on or after the date on which the Agreement is signed shall,

2

**Exhibit A**

on the thirty-first day following the beginning of such employment, become and remain members in the Union, or pay fees in lieu thereof.

2.2     When specifically authorized in writing by each employee, the Employer will deduct, from the first paycheck of each month, dues and/or fees owing the Union and forward them to the Secretary-Treasurer of the Union, not later than ten (10) days after each monthly deduction. Such authorization, once given, shall be irrevocable for a period of not less than one (1) year or the term of this Agreement whichever occurs sooner.

2.3     Upon hiring an employee or upon the request of the Union, it shall be the responsibility of the Employer to obtain from the employee a completed Application and Authorization form provided by the Union and an Enrollment Card provided by the Teamsters Local Union No. 727 Benefit Funds. The Employer will forward the same to the Union by the employee's thirty first day of employment or within thirty (30) days after a request by the Union is made.

2.4     The Union agrees to further the interests of the Employer to the best of its ability.

2.5     The Employer agrees to deduct from the paycheck of all employees covered by this Agreement voluntary contributions to Teamsters Local 727 Political Action Committee (PAC). The PAC shall notify the Employer of the amounts designated by each contributing employee that are to be deducted from each paycheck of every month. The Employer shall transmit such deductions to the Union on a monthly basis, not later than ten (10) days after the last deduction of the month.

## ARTICLE 3
## UNIFORMS

3.1     Should an employee be required to wear a uniform, the Employer agrees to furnish said uniforms and replace worn-out or damaged uniforms. The Employer shall supply such employees with uniforms that, in the opinion of the Employer, are reasonable for the season in light of the specific requirements at each location.

## ARTICLE 4
## SENIORITY

4.1     Seniority shall mean length of continuous service from an employee's first day of continuous employment in the industry as a member of the Union. Separate seniority lists shall be maintained for full-time and part-time employees and further separated by residential and commercial locations. Employees (voluntarily) changing from one seniority list to the other shall go to the bottom of that seniority list but retain their original seniority date. The Employer shall keep and make copies available to a representative of the Union accurate and up-to-date separate seniority lists, showing employees' names and first date of employment.

Seniority is to prevail at all times, except that seniority shall not apply to bargaining unit supervisors nor to the selection of bargaining unit supervisors.

All seniority shall be considered on a classification basis for purposes of layoffs with three classifications: (1) hikers; (2) porters; and (3) all other employees. In case of layoffs, the last employee hired in a particular classification is to be the first laid off in respect to the separately maintained seniority lists. An employee laid off from one seniority list shall not use his or her seniority to replace an employee on the other seniority list. Seniority shall also apply to recalls, in that the last employee laid off in a particular classification, shall be the first to be recalled in respect to separately maintained seniority lists.

**Exhibit A**

4.2     Seniority shall be broken for any one or more of the following reasons:

    (a)     Voluntarily quitting.

    (b)     Discharge for cause.

    (c)     Absence from work for three (3) consecutive working days without notifying the Employer unless prevented from doing so through no fault of the employee.

    (d)     Failure to return to work after expiration of leave of absence unless due to circumstances beyond the control of the employee or unless excused by the Employer.

    (e)     Failure to return to work within seventy-two (72) hours following recall after layoff, which notice will be made by the Employer by certified letter to the employee's last known address according to the records of the Employer.

    (f)     Is laid off for a continuous period of more than six (6) months.

    (g)     Engages in other employment while on authorized leave of absence without the consent of the Employer.

4.3     The first one hundred twenty (120) days of employment shall constitute a probationary period during which time an employee may be discharged at the sole discretion of the Employer without resort to the grievance procedure. After one hundred twenty (120) days, an employee's seniority date shall date from his or her first day of continuous employment in the industry as a member of the Union.

### ARTICLE 5
### DISCIPLINE AND DISCHARGE

5.1     No employee who has completed his or her probationary period will be discharged or disciplined except for just cause, adhering to the principles of progressive discipline as outlined in Article 31, Section 31.3 and 31.4.

5.2     The Union shall have the right to investigate the reasons for any discharge or discipline of a non probationary employee and to protest the same through the grievance and arbitration procedure. The determination of whether an employee has completed his/her probationary period will be subject to the grievance and arbitration procedure.

5.3     An employee must be notified as soon as possible of any disciplinary action.

5.4     Warning notices (including suspensions) shall not remain in effect, nor be relied upon for the next step of progressive discipline, for more than one (1) year from date of said warning notice.

### ARTICLE 6
### GRIEVANCE PROCEDURE

6.1     Any complaint, grievance, or dispute arising under or concerning the meaning, application, or compliance with the terms of this Agreement shall first be taken up for adjustment by a representative of the Employer and a representative of the Union. The Employer and the Union shall meet at a time and place mutually agreed upon after the request by either party for such a meeting.

6.2     The following Grievance Procedure shall be followed in resolving said disputes:

**Exhibit A**

STEP ONE: Grievant will meet with Union Representative and Facility Manager as outlined above.

STEP TWO: In failing to have the dispute resolved in STEP ONE, grievant will meet with a representative of the Union and a representative of the Employer at a mutually convenient time and place to resolve the grievance.

If the parties cannot agree, the dispute may then be referred by the Union to arbitration as provided for in this Section. Demand for arbitration shall be made within forty-five (45) calendar days from the date of the Step 2 grievance meeting unless the parties mutually agree to extend said timeline.

In cases wherein the Employer is not an ABOMA member, the parties may agree to an expedited Grievance Panel in lieu of FMCS arbitration provided below. Such Grievance Panel shall be selected within ten (10) business days from the receipt of the written statement of grievance, and shall consist of one (1) person selected by the Chicago Parking Association who is not a representative of the Employer against whom the grievance was filed, and one (1) person selected by the Union, and shall endeavor to settle the dispute. The Grievance Panel shall meet within ten (10) business days after being selected and shall render their decision within ten (10) business days after the meeting. Unanimous decisions by the Grievance Panel shall be final and binding on the parties, and there shall be no further recourse to Arbitration procedures or court litigation. If said Grievance Panel fails to resolve the dispute within thirty (30) business days after it is referred to the Grievance Panel, the dispute may be submitted by the Union to arbitration as outlined below in Section 6.3. The fees and expenses of the Grievance Panel shall be divided equally between the Union and the Employer.

In the case of members of ABOMA only, the dispute shall be referred to a "Board of Arbitration". A written statement of the grievance to be arbitrated shall be furnished by the Union to the Employer and ABOMA setting forth in detail the grievance requiring arbitration. The "Board of Arbitration" shall be selected within ten (10) business days from the receipt of the written statement of grievance, and shall consist of one (1) person selected by ABOMA and one (1) person selected by the Union, and shall endeavor to settle the dispute . The "Board of Arbitration" shall meet within ten (10) business days after being selected and shall render their decision within ten (10) business days after the meeting. If said "Board of Arbitration" fails to resolve the dispute within thirty (30) business days after it is referred to said Board, the matter may be submitted by the Union to arbitration as outlined below. The fees and expenses of the "Board of Arbitration" shall be divided equally between the Union and the Employer. Decisions decided under this subparagraph shall have no precedential effect and shall not be cited in arbitrations involving an Employer who is a member of the Chicago Parking Association.

6.3     Arbitration shall be by an arbitrator selected from a panel supplied by the Federal Mediation and Conciliation Service (FMCS), and his or her decision shall be final and binding upon both parties. The Union shall request a panel of seven (7) arbitrators who shall be members of the National Academy of Arbitrators ("NAA") located within the Chicagoland geographical region. The Employer shall have the first strike and the parties shall then alternate striking arbitrator names until one is chosen. The Union and the Employer will each be responsible for one-half of the cost for such arbitration proceeding. All other expenses of the arbitration shall be assumed by the party incurring them. The arbitration hearing will not be transcribed except when the arbitrator may deem necessary. At the conclusion of the hearing, the arbitrator will issue a decision with any award in writing.

**Exhibit A**

6.4     The Employer must be notified of a monetary grievance within thirty (30) days after knowledge of the alleged violation or it shall be waived.

6.5     A non-monetary (policy) grievance must be filed in writing within ten (10) days after knowledge of the alleged violation or it shall be waived.

## ARTICLE 7
### STRIKES AND LOCKOUTS

7.1     The Union agrees that there shall be no strike, slow-down, or cessation of work and the Employer agrees there shall be no lock-out during the time of this Agreement.

7.2     Should there be an unauthorized strike, slow-down, walk-out, or other unauthorized cessation of work, the Union shall not be liable for damages resulting from such unauthorized acts from its members, and the Union shall undertake every reasonable means to induce the employees to immediately return to their jobs. In the event of an unauthorized strike, slow-down, walk-out, or any unauthorized cessation of work, the Employer shall have the sole and exclusive right to discipline or discharge the employees who participate in such an event.

7.3     No employee covered by this Agreement shall be required to go through a picket line when the picket line is approved by Teamsters' Joint Council No. 25.

## ARTICLE 8
### WAGES

8.1     (a)     All employees covered by this Agreement shall receive contract anniversary wage increases over and above their present hourly wage rate. The Employer agrees to increase the total package for the compensation to be paid, for (i) all hours worked or paid for, in the form of additional hourly Wages (Article 8), (ii) additional hourly contributions to the Health & Welfare, Pension and/or Legal & Educational Assistance Fund (Article 20) as follows:

Effective November 1, 2016 ..............$ 1.44 per hour

Effective November 1, 2017 ..............$ 1.44 per hour

Effective November 1, 2018 ..............$ 1.42 per hour

Effective November 1, 2019 ..............$ 1.40 per hour

Effective November 1, 2020 ..............$ 1.40 per hour

(b)     The allocation of the annual increase required in Section 8.1 shall be determined by the Union. The Union shall notify the Employer of its determination of the allocation between Wages (Article 8) and additional contributions to the Health & Welfare, Pension and/or Legal & Educational Assistance Fund by September 1st each contract year. The maximum amounts that may be allocated to wages as determined by the Union on an annual basis are as follows:

November 1, 2016:     $0.75 per hour

November 1, 2017:     $0.75 per hour

6

**Exhibit A**

| November 1, 2018: | $0.65 per hour |
| November 1, 2019: | $0.65 per hour |
| November 1, 2020: | $0.65 per hour |

The maximum amount which can be allocated to the Legal and Educational Fund each year may not exceed $0.15 per hour. The minimum amount that must be allocated to wages during the final year of the contract shall be $0.25 per hour.

8.2    The following longevity wage scale applies for work performed at COMMERCIAL LOCATIONS.

Progression schedule for employees **HIRED PRIOR TO NOVEMBER 1, 2016** shall be as follows (also note additional premiums set out in Sections 8.5 and 8.6 below and additional service credit provided for in Section 8.7 and in Letter of Understanding #3, attached hereto):

### COMMERCIAL WAGE RATES PER HOUR
### HIRED PRIOR TO NOVEMBER 1, 2016

| Effective | 1 Year | 2 Years | 3 Years | 4 Years | 5 Years | Prior to 11/1/06 |
|-----------|--------|---------|---------|---------|---------|------------------|
| 11/1/2016 | $14.00 | $14.75 | $15.50 | $16.25 | $17.65 | $19.65 |
| 11/1/2017* | | | | | | |
| 11/1/2018* | | | | | | |
| 11/1/2019* | | | | | | |
| 11/1/2020* | | | | | | |

All Employees, including those making more than the above schedule, shall also receive the following longevity and anniversary raises:

**Year One of Employment: $1.25 per hour**

**Year Two of Employment: $0.75 per hour**

**Year Three of Employment: $0.75 per hour**

**Year Four of Employment: $0.75 per hour**

**Year Five of Employment: $1.40 per hour**

**Two dollar differential shall be maintained between last two columns. Only Employees with exactly five years of seniority or less shall receive both longevity and contract increases each year.**

\*    Contract anniversary increases shall be determined pursuant to Section 8.1, above.

**Exhibit A**

Progression schedule for new employees **HIRED ON OR AFTER NOVEMBER 1, 2016**, shall be as follows (also note additional premiums set out in Sections 8.5 and 8.6 below and additional service credit provided for in Section 8.7):

## COMMERCIAL WAGE RATES PER HOUR
## HIRED ON OR AFTER NOVEMBER 1, 2016

|            | Start   | 1 Year | 2 Years | 3 Years | 4 Years | 5 Years |
|------------|---------|--------|---------|---------|---------|---------|
| 11/1/2016  | $12.75  |        |         |         |         |         |
| 11/1/2017* |         |        |         |         |         |         |
| 11/1/2018* |         |        |         |         |         |         |
| 11/1/2019* |         |        |         |         |         |         |
| 11/1/2020* |         |        |         |         |         |         |

All Employees, including those making more than the above schedule, shall also receive the following longevity and anniversary raises:

Year One of Employment: $1.25 per hour

Year Two of Employment: $0.75 per hour

Year Three of Employment: $0.75 per hour

Year Four of Employment: $0.75 per hour

Only Employees with exactly five years of seniority or less shall receive both longevity and contract increases each year.

\* Contract anniversary increases shall be determined pursuant to Section 8.1, above.

8

**Exhibit A**

8.3 The following longevity wage scale applies for work performed at RESIDENTIAL LOCATIONS.

Progression schedule for employees **HIRED PRIOR TO NOVEMBER 1, 2016** shall be as follows (also note additional premiums set out in Sections 8.5 and 8.6 below and additional service credit provided for in Section 8.7 and in Letter of Understanding #3, attached hereto):

### RESIDENTIAL WAGE RATES PER HOUR
### HIRED PRIOR TO NOVEMBER 1, 2016

| Effective | 1 Year | 2 Years | 3 Years | 4 Years | 5 Years | Prior to 11/1/06 |
|---|---|---|---|---|---|---|
| 11/1/2016 | $14.75 | $15.50 | $16.25 | $17.00 | $18.40 | $20.40 |
| 11/1/2017* | | | | | | |
| 11/1/2018* | | | | | | |
| 11/1/2019* | | | | | | |
| 11/1/2020* | | | | | | |

All Employees, including those making more than the above schedule, shall also receive the following longevity and anniversary raises.

**Year One of Employment: $1.25 per hour**

**Year Two of Employment: $0.75 per hour**

**Year Three of Employment: $0.75 per hour**

**Year Four of Employment: $0.75 per hour**

**Year Five of Employment: $1.40 per hour**

Two dollar differential shall be maintained between last two columns. Only Employees with exactly five years of seniority or less shall receive both longevity and contract increases each year.

* Contract anniversary increases shall be determined pursuant to Section 8.1, above.

**Exhibit A**

Progression schedule for new employees **HIRED ON OR AFTER NOVEMBER 1, 2016**, shall be as follows (also note additional premiums set out in Sections 8.5 and 8.6 below and additional service credit provided for in Section 8.7):

### RESIDENTIAL WAGE RATES PER HOUR
### HIRED ON OR AFTER NOVEMBER 1, 2016

|            | Start   | 1 Year | 2 Years | 3 Years | 4 Years | 5 Years |
|------------|---------|--------|---------|---------|---------|---------|
| 11/1/2016  | $13.50  |        |         |         |         |         |
| 11/1/2017* |         |        |         |         |         |         |
| 11/1/2018* |         |        |         |         |         |         |
| 11/1/2019* |         |        |         |         |         |         |
| 11/1/2020* |         |        |         |         |         |         |

All Employees, including those making more than the above schedule, shall also receive the following longevity and anniversary raises:

Year One of Employment: $1.25 per hour

Year Two of Employment: $0.75 per hour

Year Three of Employment: $0.75 per hour

Year Four of Employment: $0.75 per hour

Only Employees with exactly five years of seniority or less shall receive both longevity and contract increases each year.

\* Contract anniversary increases shall be determined pursuant to Section 8.1, above.

8.4 In applying the above wage scales, employees shall automatically receive longevity and contract anniversary increases.

8.5 Employees functioning (1) in a cashier's capacity, (2) in primarily self-service parking surface lots, (3) as customer service representatives or (4) in ground transportation shall receive twenty-five cents ($.25) per hour over the above-schedules. If applicable, such employees shall also receive the premium set forth below in Section 8.6.

8.6 Bargaining unit supervisors employed at a residential facility, including all bargaining unit supervisors employed by members of ABOMA, shall receive thirty-six cents ($.36) per hour over the above residential schedules (Section 8.3 above). If applicable, such employees shall also receive the premium set forth in Section 8.5 above. Employer may remove the premium only if the employee is returned to his or her previous classification at the applicable contractual wage rate as if the employee had never been made a supervisor.

10

**Exhibit A**

8.7  The Employer agrees for the purpose of determining the wage rate of its employees (see schedules above) to give credit to any employee the amount of continuous days, months, and years of service said employee acquired under collective bargaining agreements of the Union and said employees shall be paid as set forth above.

8.8  It is understood and agreed that the red-circle provisions in Sections 8.2 and 8.3 and section 27.1 shall incorporate and include any pay increase(s) granted to employees since October 31, 2011 regardless of the reason for the increase.

## ARTICLE 9
## HOLIDAYS

9.1  Regular full-time employees shall receive additional compensation for the eight (8) holidays listed below equal to their normal workday hours but not less than eight (8) hours pay at their regular daily straight-time rate of pay. Those employees who are scheduled and do work on any of these eight (8) holidays will receive their regular daily straight-time rate of pay in addition to time and one-half (1 ½) per hour for all hours actually worked on said eight (8) holidays. To be entitled to holiday pay under this clause, the employee must work for the Employer six (6) months and work his or her scheduled workday before and his or her scheduled workday after said holiday if the employee is scheduled to work. An employee who is scheduled to work on a holiday but fails to report to work shall forfeit his or her right to holiday pay unless his or her absence is due to extenuating circumstances. For the purpose of holiday pay and overtime pay on holidays, the holidays listed below will be celebrated on the calendar days they fall on:

New Year's Day

Martin Luther King, Jr.'s Birthday

Memorial Day

Independence Day

Labor Day

Thanksgiving Day

Christmas Day

Employee's Birthday

9.2  A holiday for which an employee is paid and during which he or she did not work shall be considered as time actually worked by him or her under the terms of this Agreement. No employee shall receive holiday pay unless he or she has attained six (6) months' seniority with the Employer on or before the date of the holiday.

9.3  Part-time employees, when working on said holidays, shall be entitled to time and one-half (1 ½) per hour for hours worked. All work performed on the sixth (6th) day of a holiday week shall be paid at the overtime rate.

11

**Exhibit A**

The additional compensation for each holiday (holiday pay) for part-time employees shall be based upon the average weekly hours scheduled as follows:

| Weekly Hours Scheduled | Holiday Pay |
|---|---|
| Up to 19 hours | 2 hours |
| 20 to 29 hours | 4 hours |
| 30 to 39 hours | 6 hours |

## ARTICLE 10
## MILITARY SERVICE

10.1    Employees who become members of the U.S. Armed Services shall have such rights of reemployment as may be prescribed by the Military Selective Service Law.

## ARTICLE 11
## JURY DUTY

11.1    Employees on the payroll with ninety (90) days or more of service will be reimbursed for any loss of income incurred during the time spent on jury service with a maximum of ten (10) days annually.

## ARTICLE 12
## SICK AND PERSONAL LEAVE

12.1    A full-time employee who has worked for the Employer for six (6) months or longer shall be entitled to nine (9) combined sick and/or personal days per year at the employees normal rate of pay for their normal workday hours but not less than eight (8) hours pay. Effective November 1, 2020, all full time employees shall receive one (1) additional sick and/or personal day per year.

12.2    A part-time employee who has worked for the Employer for six (6) months or longer shall be entitled to nine (9) combined sick and/or personal days per year based upon the average weekly hours scheduled as follows:

| Weekly Hours Scheduled | Personal/Sick Leave Pay |
|---|---|
| Up to 19 hours | 2 hours |
| 20 to 29 hours | 4 hours |
| 30 to 39 hours | 6 hours |

Effective November 1, 2020, all part-time employees shall receive one (1) additional sick and/or personal day per year.

**Exhibit A**

12.3    The employee shall give one week's notice to the Employer for days used for personal leave. The employee shall phone a designated phone number and, if no answer, a designated back-up phone number at least two (2) hours before his or her regularly scheduled starting time for days used for sick leave. Sick and personal days shall be non-cumulative.

12.4    Sick and/or personal days shall be earned and taken on a calendar year basis. All employees who have completed six (6) months of employment by December 31st shall receive their full complement of sick and/or personal days on January 1st of each year, to be used by December 31st of each year. All employees who have not completed six (6) months of employment by December 31st shall receive their full complement of sick and/or personal days upon completion of six (6) months of employment, to be used by December 31st of that year. In the event that all of the employee's earned sick and/or personal days are not taken by December 31st, the Employer shall pay the employee the value of said sick and/or personal days.

12.5    Employees shall receive an accounting of all their accrued sick and personal days, no less frequently than monthly.

12.6    A sick or personal day for which an employee is paid and during which he or she did not work shall be considered as time actually worked by him or her under the terms of this Agreement.

12.7    The provisions of this Article are in lieu of the rights and benefits provided by the Cook County Earned Sick Leave Ordinance and the City of Chicago Paid Sick Leave Ordinance. The parties expressly agree that all rights and benefits under the Cook County Earned Sick Leave Ordinance and the City of Chicago Paid Sick Leave Ordinance are hereby waived.

## ARTICLE 13
## FUNERAL LEAVE

13.1    A regular full-time or regular part time employee who loses time from his or her employment due to a death in his or her immediate family shall be entitled to receive his or her regular pay during said absence for four (4) days. Part time employees will receive up to four (4) days of Funeral leave provided the employee is regularly scheduled at least four (4) days per week. Immediate family members are defined to be father, mother, brother, sister, spouse, child, father-in-law, mother-in-law or grandparents.

13.2    In order to qualify for funeral leave pay, the employee must have worked for the Employer for six (6) months or longer.

13.3    Employees must, upon request from the Employer, furnish satisfactory proof of death and relationship.

13.4    Funeral leave shall only be granted for the purpose of attending the funeral of the deceased, grieving and settling the affairs of the deceased.

## ARTICLE 14
## VACATIONS

14.1    Employees shall receive vacation in accordance with the following schedule:

After one (1) year of employment, one (1) weeks vacation

After two (2) years of employment, two (2) weeks vacation

**Exhibit A**

After five (5) years of employment, three (3) weeks vacation

After ten (10) years of employment, four (4) weeks vacation

After twenty-five (25) years of employment, five (5) weeks vacation

14.2

    (a)    A vacation bank shall be established for each employee. The Employer shall deposit the amount of all vacation time that is owed to the employee. In addition, employees shall begin to accrue vacation on a monthly basis in accordance with (b), which accrued vacation time shall be added to the employee's vacation bank.

    (b)    Vacations shall be earned on a monthly basis in accordance with the following schedule:

After one (1) year of employment: .417 vacation days per month (equivalent to one (1) weeks vacation):

Beginning with the first month of employment and continuing through the month prior to the month in which the employee completes two (2) years of employment (1st month through 23rd month of employment), employees accrue .417 vacation days per month.

After two (2) years of employment, .834 vacation days per month (equivalent to two (2) weeks vacation):

Beginning with the month in which the employee completes two (2) years of employment and continuing through the month prior to the month in which the employee completes five (5) years of employment (24th month through 59th month of employment), employees accrue .834 vacation days per month.

After five (5) years of employment, 1.25 vacation days per month (equivalent to three (3) weeks vacation):

Beginning with the month in which the employee completes five (5) years of employment and continuing through the month prior to the month in which the employee completes ten (10) years of employment (60th month through 119 month), employees accrue 1.25 vacation days per month.

After ten (10) years of employment, 1.67 vacation days per month (equivalent to four (4) weeks vacation):

Beginning with the month in which the employee completes ten (10) years of employment and continuing through the month prior to the month in which the employee completes twenty-five (25) years of employment (120th month through 299th month), employees accrue 1.67 vacation days per month.

After twenty-five (25) years of employment, 2.084 vacation days per month (equivalent to five (5) weeks vacation):

Beginning with the month in which the employee completes twenty-five (25) years of employment and continuing for each month thereafter (300th month and beyond), employees accrue 2.084 vacation days per month.

14

**Exhibit A**

(c)    The month in which employment begins and the month in which employment ends shall be considered a full month for purposes of this Section.

(d)    Employees shall be entitled to use vacation time immediately after accruing.

(e)    Every December 1st, each employee shall be given the option of a payout or carry over of unused vacation days in his or her vacation bank; provided, however, that the carry over will be limited to accruals in the prior twelve (12) months. Should the employee receive a payout, such employee shall receive the payout on the next scheduled pay period.

(f)    Employees shall receive an accounting of all their accrued vacation, no less frequently than monthly.

14.3    Vacation pay for part-time employees shall be prorated in accordance with the above schedule.

14.4    Employees shall be paid their earned vacation pay prior to the time they leave on vacation.

14.5    Preference by seniority shall be given to an employee's choice of vacation period.

14.6    Employees shall receive vacation pay on the basis of average hours worked in the previous year. All hours worked or paid for (vacation, personal days, holidays, sick days, funeral leave pay) shall be considered as hours worked in determining compensation. Employees shall also accrue vacation while on Workers' Compensation.

14.7    Vacation checks shall be issued separately.

14.8    A vacation day for which an employee is paid and during which he or she did not work shall be considered as time actually worked by him or her under the terms of this Agreement.

## ARTICLE 15
## LEAVE OF ABSENCE

15.1    The Employer may, at its sole discretion, grant a personal leave of absence to an employee with seniority provided:

(a)    The employee requests the leave, in writing, at least one (1) week in advance of such a leave, unless there was no possibility that the employee had such prior knowledge of the necessity of the leave. Approved leaves shall be in writing with a copy to the Union; and

(b)    The leave is for a specified time not to exceed thirty (30) calendar days in duration which may be extended for an additional specified time not to exceed an additional thirty (30) calendar days in duration at the sole discretion of the Employer.

(c)    Upon the expiration of an employee's authorized personal leave of absence, said employee shall be reinstated with full seniority to the same or substantially equivalent employment.

15.2    The Employer may implement the Family Medical Leave Act (FMLA) consistent with applicable law, and the provisions of this section. The Employer shall grant family and medical leaves to employees entitled by law to such leaves.

15.3    The Employer shall continue to contribute to the Health and Welfare Fund during FMLA leaves, to the extent required by law.

15

**Exhibit A**

15.4    In all cases of medical leave, regardless of whether the leave is a FMLA leave, the Employer may require employees to submit to medical examinations by a physician chosen by the Employer at the Employer's expense, during the leave and before the employee returns to work.

15.5    Upon expiration of an authorized medical or family or medical leave, an employee shall be reinstated with full seniority to the same or substantially equivalent employment (unless the employee would have been laid off or terminated had the employee not taken a leave). It is understood that employees returning to work from a leave (or any illness or injury) must be able to acceptably perform all essential job functions and may not constitute a threat to safety.

## ARTICLE 16
## HOURS OF WORK

16.1    Full-time employees covered by this Agreement who are called to work shall receive not less than six (6) hours work or its equivalent per day.

16.2    Part-time employees covered by this Agreement who are called to work shall receive not less than four (4) hours work or its equivalent per day.

16.3    There shall be no split shift assignments for employees within a twenty-four (24) hour period covered by this Agreement.

16.4    Any regular employee shall forfeit his or her weekly guarantee in that week in which he or she takes off a regularly scheduled workday or any portion thereof on his or her own initiative or when an employee is discharged for cause. However, an employee before leaving the Employer's premises shall be required to punch out.

16.5    All regular full-time employees covered by this Agreement shall be guaranteed a workweek consisting of forty (40) hours exclusive of one-half (1/2) hour for a lunch period each day. Said workweek shall contain two (2) consecutive days off where possible for the Employer to so operate. For employees employed at residential locations only, time and one-half (1 ½) shall be paid for all hours worked over eight (8) hours daily. For all employees, time and one- half (1 ½) shall be paid for all hours worked over forty (40) hours in any one (1) week exclusive of the thirty (30) minute lunch period each day. Overtime shall not be paid twice for the same hours worked.

16.6    If an Employer has any employees covered by the Fair Labor Standards Act, overtime shall be paid in accordance with said Act and at least thirty (30) minutes shall be allowed each day without pay for employees' lunch period.

16.7    When feasible, the Employer shall post the employee's schedule at least seven (7) days in advance.

## ARTICLE 17
## LIMITATIONS ON PART TIME EMPLOYEES

17.1    No Employer shall have more than forty-two percent (42%) of total employees covered under this Agreement as part time employees.

## ARTICLE 18
## TRANSFERS

18.1    Transfers may not be made except for good cause subject to recourse through the grievance procedure or by agreement between the Employer and the Union. In emergency situations,

16

**Exhibit A**

however, an employee may be required to work at a different location for one (1) day. In the event an employee is transferred to a new location which requires a drug test the employee will have the option to refuse the drug test and shall be subject to layoff should his seniority warrant layoff. If the employee submits to the drug test and the test is positive, the employee will be subject to the terms and conditions of the drug testing policy.

## ARTICLE 19
## DRIVER'S LICENSE

19.1    All employees shall continuously have and shall exhibit to the Employer upon request an unrestricted State Driver's License if necessary to perform his or her job. Any employee found not to have same in his or her possession will be suspended for up to thirty (30) days until a valid license is presented. After that time, the employee may be subject to termination. The Employer has the right to run MVR checks and terminate/not hire based only upon lack of valid license.

## ARTICLE 20
## HEALTH AND WELFARE, PENSION AND LEGAL AND EDUCATIONAL ASSISTANCE

20.1    Health and Welfare

(a)    The Employer shall contribute to Teamsters Local Union No. 727 Health and Welfare Fund on account of each regular full-time employee covered by this Agreement the following:

Commencing November 1, 2016 ...........................................$1,059.00 per month

Such rate shall continue except as adjusted by the Board of Trustees pursuant to the provisions of Article 20, Section 20.4 below.

(b)    The Employer shall contribute monthly to Teamsters Local Union No. 727 Health and Welfare Fund on account of each part-time employee covered by this Agreement the following:

Commencing November 1, 2016...........................................$6.10 per hour

Such rate shall continue except as adjusted by the Board of Trustees pursuant to the provisions of Article 20, Section 20.4 below.

(c)    Contributions due hereunder to the Health and Welfare Fund for all employees hired on or after November 1, 2016, shall commence with the month in which their employment begins.

20.2    Pension

(a)    The Employer shall contribute to Teamsters Local Union No. 727 Pension fund on account of each regular full-time employee covered by this Agreement the following:

Commencing November 1, 2016 .........................................$385.00 per month

Such rate shall continue except as adjusted by the Board of Trustees pursuant to the provisions of Article 20, Section 20.4 below.

(b)    The Employer shall contribute monthly to Teamsters Local Union No. 727 Pension Fund on account of each part-time employee covered by this Agreement the following:

**Exhibit A**

Commencing November 1, 2016 .........................................$2.20 per hour

Such rate shall continue except as adjusted by the Board of Trustees pursuant to the provisions of Article 20, Section 20.4 below.

(c) Contributions due hereunder to the Pension Fund for all employees shall commence with the month succeeding that month in which employment begins; provided, however, that contributions to the Pension Fund on account of newly hired employees shall commence with their thirteenth (13th) month of employment. For purposes of this Section, a newly hired employee is defined as an employee hired on or after November 1, 2006 for which no contributions were received by the Pension Fund within the six (6) months prior to hire.

20.3 Legal and Educational Assistance

(a) The Employer shall contribute to Teamsters Local Union No. 727 Legal and Educational Assistance Fund on account of each regular full-time employee covered by this Agreement the following:

Commencing November 1, 2016 .........................................$112.00 per month

Such rate shall continue except as adjusted by the Board of Trustees pursuant to the provisions of Article 20, Section 20.4 below.

(b) The Employer shall contribute monthly to Teamsters Local Union No. 727 Legal and Educational Assistance Fund on account of each part-time employee covered by this Agreement the following:

Commencing November 1, 2016 .........................................$ 0.65 per hour

Such rate shall continue except as adjusted by the Board of Trustees pursuant to the provisions of Article 20, Section 20.4 below.

(c) Contributions due hereunder to the Legal and Educational Assistance Fund for all employees shall commence with the month in which employment begins.

20.4 The contribution rates payable to the Health and Welfare, Pension and Legal and Educational Assistance Funds pursuant to Sections 20.1, 20.2 and 20.3 above shall be increased as follows:

(a) It is agreed that the Employer shall contribute additional amounts over and above those required in Sections 20.1(a), 20.2(a) and 20.3(a) to the Health and Welfare, Pension and/or Legal and Educational Assistance Funds, combined, on behalf of each full time employee as follows:

Effective 3/1/2017.............$119.60 per month
Effective 3/1/2018............$TBD Per Sec. 8.1
Effective 3/1/2019............$TBD Per Sec. 8.1
Effective 3/1/2020.............$TBD Per Sec. 8.1
Effective 3/1/2021.............$TBD Per Sec. 8.1

(b) The distribution of the additional contributions required in (a) above to the Health and Welfare, Pension, and/or Legal and Educational Assistance Funds shall be left to the decision of the Board of Trustees of the respective Funds.

18

**Exhibit A**

     (c)    It is further agreed that the Employer shall contribute an equivalent additional hourly amount over and above those required in Sections 20.1(b), 20.2(b) and 20.3(b) to the Health and Welfare, Pension and/or Legal and Educational Assistance Funds on behalf of part time employees.

20.5    For the purpose of contributions to the Health and Welfare, Pension and Legal and Educational Assistance Funds only, any part-time employee who works one hundred twenty eight(128) hours or more in a calendar month shall be considered a regular full-time employee and full-time employee contributions will be required for that month.

20.6    Part time per hour contributions to the Health and Welfare, Pension and Legal and Educational Assistance Funds are due only up to the amount of the applicable full time contribution.

20.7    No contributions to the Health and Welfare, Pension and Legal and Educational Assistance Funds shall be required on behalf of any employee who is on a leave of absence, except as required by law.

20.8    By the execution of this Agreement, each Employer authorizes the Trustees to enter into appropriate trust agreements necessary for the administration of such funds, and hereby waiving all notice thereof and ratifying all actions already taken or to be taken by such Trustees within the scope of their authority.

20.9    It is also agreed that in the event the Employer is delinquent at the end of a month in the payment of its contributions to the Health and Welfare, Pension or Legal and Educational Assistance Funds created under this Agreement; in accordance with the rules and regulations of the Trustees of such Funds, the employees or their representatives shall have the right to take such action as they deem necessary until such delinquent payments are made, and it is further agreed that in the event such action is taken, the Employer shall be responsible to the employee for losses resulting therefrom.

20.10    Should the Trustees of the Health and Welfare, Pension or Legal and Educational Assistance Funds audit the records of the Employer, such audit shall not exceed three (3) years from the date of notice of audit.

### ARTICLE 21
### MANAGEMENT RIGHTS

21.1    All rights, powers, and authority customarily exercised by the Employer are retained and reserved by the Employer except as otherwise specifically modified by express provisions of this Agreement.

### ARTICLE 22
### DOCTORS' EXAMINATIONS

22.1    All doctors' examinations requested by the Employer will be paid for by the Employer. In the event the employment of the employee is terminated on the basis of the report of the Employer's doctor, or in the event of questionable status of employee's health upon being rehired due to a layoff, the Union may, at its own cost, have such report checked by a doctor of its election.

**Exhibit A**

## ARTICLE 23
### TIME RECORDS

23.1    The Employer shall keep accurate time records and make them available for inspection by the Union upon request so that there will be no misunderstanding about the employee's time.

## ARTICLE 24
### ACCESS TO FACILITY

24.1    Authorized agents of the Union shall have access to the Employer's establishment during working hours for the purpose of adjusting disputes and investigating working conditions; provided, however, that there is no interruption of the Employer's working schedule.

## ARTICLE 25
### SHIFT CHANGES

25.1    If the Employer has legitimate cause, it may change shifts provided that it provides employees with the required advance notice. Employees must receive seven (7) days notice of a shift change.

## ARTICLE 26
### PAYDAY

26.1    Payday shall be at least as often as biweekly (every two weeks). Employees must receive a paper or electronic paycheck; an Employer is prohibited from paying an employee in cash.

## ARTICLE 27
### MAINTENANCE OF BENEFITS

27.1    Employees covered by this Agreement receiving wages or conditions (excluding overtime) over and above those listed in this Agreement shall suffer no economic loss as the result of signing this Agreement or during the term of this Agreement. No employee covered by this Agreement shall receive less than the terms and conditions therein specified.

## ARTICLE 28
### INDIVIDUAL AGREEMENTS

28.1    There shall be no side deals or individual agreements whether orally or in writing, between any Employer and employee or between Employers. No employee or Employer, either orally or in writing, shall enter into any agreement, contract, or arrangement covering any employment to which this Agreement applies which is contrary to or conflicting with the terms and conditions of this Agreement.

## ARTICLE 29
### NON-DISCRIMINATION

29.1    It is the policy of both the Employer and the Union to comply with all Federal and State Equal Employment Opportunity Laws and not to discriminate against any employee because of race, sex, color, religion, national origin, age, membership or non-membership in the Union, or any protected category.

**Exhibit A**

## ARTICLE 30
## PENSION - UNFUNDED LIABILITY

30.1 Upon the request in writing from any Employer signatory hereto, addressed to the Benefit Funds, the Benefit Funds shall be required to furnish such Employer an annual statement for the most recent period available on the Employer's withdrawal liability, if any. It is agreed that such requests shall be limited to one (1) each year from each Employer.

## ARTICLE 31
## SHORTAGES

31.1 Employees shall be accountable for all receipts collected by them and responsible for their errors in the collection of parking tickets. Employers shall have the right to summarily dismiss an employee for stealing, misrepresentation of the receipts, or for failure to explain to the satisfaction of the Employer repeated errors in parking tickets, reports, and collections, except as set forth below.

31.2 Employees shall be informed of their shortages, if any, within thirty (30) days after discovery of the shortage, but in no event later than sixty (60) days after the shortage occurred. Shortages, if any, shall be recovered within two (2) pay periods after the employee is notified of the shortage, or longer if required by law.

31.3 In the event of shortages of $5.00 or more, the Employer will follow the progression of discipline set forth below when appropriate, subject to such facts as may be present in each case, and subject to the just cause requirement of the collective bargaining agreement:

### GUIDELINES

| CASHIER SHORTAGE OCCURRING IN A SINGLE TWELVE MONTH PERIOD | ACTION TO BE TAKEN GENERALLY APPLIED |
|---|---|
| 1st | Oral Warning |
| 2nd | Written Warning |
| 3rd | 3-Day Suspension without pay |
| 4th | Discharge |

31.4 It is understood that the foregoing constitute agreed-upon disciplinary guidelines. However, if unusual situations or extenuating circumstances are present, the situation may warrant consideration of deviation from the guidelines based upon all the facts available for review. Accordingly, these guidelines are intended to be used as a guide for the considered judgment of supervisory personnel who must in each case view all of the facts of an employee shortage in their proper context.

31.5 If the employee disagrees with the shortage charge, the matter may be processed through the grievance procedure.

**Exhibit A**

## ARTICLE 32
## EMPLOYEE LIABILITY

32.1 Except as provided for in Article 31, no employee shall be held financially responsible for damages incurred in the performance of his or her daily duties.

32.2 No employee shall be charged for any insurance premiums or for any deductibles or costs related to any insurance claim or any other claim of damage to person or property.

## ARTICLE 33
## CHANGE IN OWNERSHIP OR MANAGEMENT

33.1 In the event an Employer acquires, loses, closes, or anticipates losing a location which falls within the scope of this Agreement, the Employer will give the Union fifteen (15) days written notice, on the form provided by the Union, prior to the effective date thereof, or immediate written notice if the acquisition or loss is to take place in less than fifteen (15) days, and said Employer will meet at the Union's request before the acquisition or loss to discuss all matters pertinent to said acquisition or loss. At the time of location change, the former Employer shall pay out all wages and benefits owned under this Agreement, including accrued vacation, to all former employees, unless the former Employer operates a residential location with a "pass through" contractual provision.

33.2 Subject to the provisions herein, any employee who has continuously worked at a location for one hundred and eighty (180) days or more will be retained by the acquiring Employer when an Employer acquires a new location. The Employer losing the location will be obligated to retain all other employees. Provided, however, that regardless of length at location, the Employer losing the location shall retain any employee who was previously terminated by the acquiring Employer, if such termination was upheld through the Grievance and Arbitration Procedure, or the Union decided not to pursue such termination through the Grievance and Arbitration Procedure. Full time Employees of the Employer losing the location who work less than 20 hours per week on average at the location being transitioned shall be retained by the Employer losing the location. Full time employees of the Employer losing the location who work 20 hours or more than per week on average at the location being transitioned shall be retained by the acquiring Employer and shall be provided with a full time schedule which can be created by laying off a part time employee employed elsewhere.

33.3 Within fifteen (15) days of the loss of a location, the Employer who lost the location shall pay to employees who are retained by the acquiring Employer the value of all accrued vacation, accrued sick/personal days and compensation earned under this Agreement but not taken and/or paid. In addition, the Employer who lost the location shall pay the respective Benefit Funds any amounts owed. The acquiring Employer shall provide said employees with corresponding time-off without pay which the employee may use by December 31st. Upon commencing employment with the acquiring Employer, employees shall be credited with all seniority, as described in Article 4, Section 4.1, as though there had not been an Employer change.

## ARTICLE 34
## CREDIT UNION

34.1 The Employer agrees to deduct from the employee's regular paycheck and forward to the credit union designated by the Union such sums as the employee may voluntarily decide to deposit. The

22

**Exhibit A**

employee will notify the Employer by written authorization of the amount to be deducted and deposited. Such deduction will be on a biweekly basis and forwarded to the credit union.

## ARTICLE 35
## DRIVE AUTHORIZATION AND DEDUCTION

35.1   The Employer agrees to deduct from the paycheck of all employees covered by this Agreement voluntary contributions to DRIVE. DRIVE shall notify the Employer of the amounts designated by each contributing employee that are to be deducted from his or her regular paycheck on a biweekly basis. The Employer shall transmit to DRIVE National Headquarters on a monthly basis, in one check the total amount deducted along with the name of each employee on whose behalf a deduction is made, the employee's Social Security number and the amount deducted from the employee's paycheck.

## ARTICLE 36
## OPEN FULL-TIME POSITIONS

36.1   Any full-time positions that become open must be offered to part-time employees at that location as follows:

(a)   Only part time employees who work at the location in which the full time position is available must be offered the position.

(b)   These part time employees are to be offered the position in seniority order, starting with the part time employee with the most seniority.

(c)   Such seniority is not length of time at the location, but rather Union seniority, as defined in Article 4, Section 4.1.

## ARTICLE 37
## LABOR MANAGEMENT COMMITTEE

37.1   The Employer agrees to contribute four dollars ($4.00) per month to the Parking Industry Labor Management Committee (PILMC) for each employee covered by this Agreement.

## ARTICLE 38
## LOCATION/FACILITY CLASSIFICATION

38.1   The parties recognize that it is necessary to classify locations/facilities for purposes of this Agreement and the Agreement applicable to valet service locations. All locations/facilities that are covered under these Agreements as of November 1, 2001 will retain their current classification. Any location/facility not covered by these Agreements as of November 1, 2001 will be classified by mutual agreement between the Employer and the Union using the following guidelines:

(a)   Commercial: All locations in which fifty percent (50%) or more of the vehicles parked at the location belong to the general public are commercial locations. Commercial locations include locations with valet parking services where there is any parking spaces in the building where the location exists.

(b)   Residential: All locations of employer members of ABOMA and all other locations in which more than fifty percent (50%) of the vehicles parked at the location belong to residents of the property are residential locations.

**Exhibit A**

    (c)    Valet: All locations that strictly provide valet parking services without any physical parking facility are valet locations and are covered by the Agreement covering valet service locations.

38.2    The Employer and the Union agree that employees employed as bellmen or doormen will be covered under the classification for the location where they are employed.

38.3    Employees are permitted to work at multiple locations/facilities. While performing such work, employees shall be compensated for all hours worked at the location/facility under the Agreement covering that location/facility; provided, however, that where an Employer transfers an employee to another location/facility under the provisions of Article 18, such employee shall be paid the highest wage rate in effect under any of the Agreements the employee works under.

## ARTICLE 39
## TEAMSTERS-NATIONAL 401(K) SAVINGS PLAN

39.1    The Employer hereby agrees to participate in the Teamsters-National 401(k) Savings Plan ("the Plan") on behalf of all employees represented for purposes of collective bargaining under this Agreement. The Employer will make or cause to be made payroll deductions from participating employees' wages, in accordance with each employee's salary deferral election subject to compliance with ERISA and the relevant tax code provisions. The Employer will forward withheld sums to the Plan at such time, in such form and manner as required pursuant to the Plan and Declaration of Trust (the "Trust"). The Employer will execute a Participation Agreement with the Union and the Trustees of the Plan evidencing employer participation the Plan effective prior to any employee deferral being received by the Plan. In addition, the Employer agrees to require the payroll system provide separate paycheck deductions so that the Plan may allow participant loans. The Employer further agrees, at such times as it is administratively feasible, to require the payroll system to provide separate paycheck deductions so that the Plan may allow after-tax contributions.

## ARTICLE 40
## MISCELLANEOUS

40.1    Once employed, no employee shall be required to take a polygraph, behavioral analysis, background check or other similar test.

40.2    Employees, except for porters, may not be required to perform janitorial services; however, in accordance with past practices, employees may be directed to clean immediate areas visible to customers as well as office and employee restroom areas.

40.3    An employee may not be discharged or disciplined because his/her earnings have been subjected to two (2) or less wage garnishment deduction orders within one (1) year.

40.4    Past practices regarding car washing will prevail at each location, except that an agreement must be reached with the Union regarding the wages, hours, terms and conditions of employment for such work in any one of the following circumstances:

    (a)    where the method of washing cars or the number of cars to be washed per shift or otherwise is to be substantially changed;

    (b)    instituting car washing at any location where cars have not been washed during the past twelve (12) months; or

**Exhibit A**

(c)    instituting car washing at new garages.

40.5    Drug and alcohol testing will only be permitted for probationary employees and reasonable suspicion under the terms and conditions of the Drug and Alcohol Policy and Testing Program agreed to by the Employer and the Union. An Employer acquiring a location pursuant to Article 33 (Change in Ownership or Management) shall have the right to perform one (1) Drug and Alcohol or Background test pursuant to the existing policy and practices within the acquiring employer's first thirty (30) days of employing acquired employee. Under these circumstances, an acquired employee's refusal to submit to the Drug and Alcohol or Background test shall result in termination of employment. Positive test results from the Drug and Alcohol test under these circumstances shall be handled in accordance with the terms of the existing policy and practices.

40.6    An Employer acquiring an location pursuant to Article 33 (Change in Ownership or Management) may conduct a Background check and refuse to employ an individual whose Background check under such circumstances reports the conviction of a Class 3 (or more serious) Felony. If the background check results in the refusal to employ the employee, the former employer is under no obligation to retain the employee, provided that the former employer can establish just cause that it would not have otherwise retained the employee due to a violation of company policy to disclose a class 3 (or more serious) Felony.

40.7    On or after November 15, 2016, the Union agrees that in the event any agreement is executed by the Union with any other Parking Industry Employer which provides for a lower wage rate, reduced benefits, or changed working conditions than those provided in this Agreement, then the Employer may have such lower wage rates, or reduced benefits, or changed working conditions substituted in this Agreement. The Union shall provide advance, written notice to the Chicago Parking Association in the event it requests an exception to this provision for any newly organized Employer, or for any Employer who has not previously been signatory to an agreement with the Union. Upon receipt of such notice, the Chicago Parking Association agrees to designate representatives to meet and confer with the Union regarding this request. If the Chicago Parking Association does not respond, within seven (7) working days, to such a request by the Union, then the Union may enter into any such agreement without agreement from the Employer.

40.8    Members of ABOMA other than those listed in Schedule A who elect to adopt this Agreement shall notify ABOMA to that effect. Notice of election to adopt this Agreement shall be made by members of ABOMA in writing and ABOMA shall in turn notify the Union. Such notice shall state the name, and location of the building to which the election applies and the name of the Employer. If any building which is paying its employees who are covered by this Agreement wages higher than those provided in this Agreement shall desire to adopt this Agreement, it shall not reduce such higher wages during the term of this Agreement.

40.9    On the next scheduled pay period after separation of employment, an employee shall be paid all compensation owed including wages, accrued vacation days, and accrued sick/personal days, and applicable contributions will be made to the Teamsters Local 727 Health and Welfare, Pension and Legal and Educational Assistance Funds.

**Exhibit A**

THIS AGREEMENT shall be binding upon and inure to the benefit of the parties hereto and their respective administrators, executors, successors, and assigns.

THIS AGREEMENT shall be constructed as divisible as to each Employer and the failure of any Employer to abide by the terms hereof shall not operate to terminate this Agreement as to any other Employer. No breach of this Agreement by any Employer shall operate to subject ABOMA or another Employer to any legal liability to the Union.

THIS AGREEMENT shall go into effect November 1, 2016, and shall continue in full force and effect until and including October 31, 2021, and shall continue thereafter on an annual basis from year to year unless written notice of desire to amend the Agreement is given by either party sixty (60) days prior to October 31, 2021, or sixty (60) days prior to October 31 of any subsequent year. Employer agrees that the Chicago Parking Association or ABOMA (if it is a member of ABOMA) shall bargain any successor Agreement on the Employer's behalf unless Employer provides written notice otherwise to the Union, the Chicago Parking Association, and ABOMA as appropriate sent via certified mail sixty (60) days prior to October 31,2021, or sixty (60) days prior to October 31 of any subsequent year should this Agreement be extended.

EXECUTED at Chicago, Illinois, this *1st* day of FebRUARY, 201 9.

FOR THE EMPLOYER

FOR THE UNION

Ahmad Bambooyani

_____

_____

26

**Exhibit A**

## LETTER OF UNDERSTANDING #1

For River North Car Wash only, it is agreed that due to inclement weather or other business reasons, full-time employees may receive less than forty (40) hours a week. Such discretion shall not be exercised unreasonably by River North Car Wash, shall be subject to the grievance procedure outlined in Article 6 of the Collective Bargaining Agreement, and shall affect only employees whose job duties are to wash cars and other related duties.

EXECUTED at Chicago, Illinois, this 1st day of FEBRUARY 201 9.

FOR THE EMPLOYER                                          FOR THE UNION

_____                    _____

27

**Exhibit A**

### LETTER OF UNDERSTANDING #2

This Letter of Understanding is entered into between Hotel Employers and Teamsters Local 727, and is hereby attached to the parties' collective bargaining agreement that is in effect from November 1, 2011 through October 31, 2016.

The parties agree that, notwithstanding any provision to the contrary in their collective bargaining agreement, during the first 3 months (January, February and March) of each calendar year, the Employer may require of any bargaining unit employee one or the other, but not both, of the following:

1.      To be involuntarily furloughed for up to three (3) weeks(one (1) day per week for up to fifteen (15) weeks) of an employee's equivalent annual vacation entitlement during this 3 month period. Any bargaining unit employee selected for this involuntary furlough may elect to use any earned vacation for any of these furloughed hours, in lieu of an absence without pay. If an employee so elects to use their earned vacation pay, they may still request unpaid time off during the remaining nine (9) months of any calendar year.

2.      To have a full time schedule reduced to 32 hours.

EXECUTED at Chicago, Illinois, this 1ˢᵗ day of ___February___, 2019.

FOR THE EMPLOYER                                      FOR THE UNION

_____                      _____

28

**Exhibit A**

## LETTER OF UNDERSTANDING #3

This Letter of Understanding is entered into between the Employer and Teamsters Local 727, and is hereby attached to and incorporated into the parties' collective bargaining agreement that is in effect from November 1, 2011 through October 31, 2016 ("the CBA").

Beginning with an Eligible Employee's (as defined herein) anniversary date, which occurs next following November 1, 2014, the parties agree that, in addition to the wage increases provided in Article 8 of the CBA, Employees who were hired between November 1, 2006 and October 31, 2011, ("Eligible Employees") will receive an additional increase of $0.30 per hour effective on their respective date of hire ("anniversary date") each year between November 1, 2014 through October 31,2020. The Eligible Employee shall receive a final increase under this Side Letter of Agreement #3 of $0.20 in the next contract year (November 1, 2020 through October 31, 2021) An Eligible Employee shall accumulate wage increases under this Side Letter of Agreement #3 totaling $2.00 per hour. Employees hired between November 1, 2006 and October 31, 2011 who received a $2.00 increase during the period November 1, 2011 to April 6, 2015 or who are otherwise receiving the Top-Pay Scale, as described in Article 8 of the CBA are not eligible for increases under this Side Letter #3.

The wage increases required by this Side Letter #3 shall be retroactive to November 1, 2014 for only those Eligible Employees whose anniversary date occurred between November 1, 2014 and the date of execution of this Side Letter #3. This Side Letter of Agreement shall survive the expiration of the CBA until the accumulation of a total of $2.00 per hour in increases by the last of employees eligible to receive increases hereunder, unless, it is deleted through the collective bargaining process. Notwithstanding the foregoing, this Side Letter of Agreement #3, will cease to exist and will be deleted from any further Collective Bargaining Agreement upon the accumulation of a total of $2.00 per hour in increases by the last of employees eligible to receive increases hereunder.

EXECUTED at Chicago, Illinois, this ___1st___ day of ___February___, 2019.

FOR THE EMPLOYER                    FOR THE UNION

_____           _____

**Exhibit A**